594 P.2d 112

The STATE of Arizona, Appellant,

v.

Richard William CLAXTON, Appellee.

No. 2 CA–CR 1579.

Court of Appeals of Arizona,
Division 2.

March 9, 1979.

Rehearing Denied April 12, 1979.

Review Denied May 1, 1979.

Stephen D. Neely, Pima County Atty., by D. Jesse Smith, Deputy County Atty., Tucson, for appellant.

Stephen M. Weiss, Tucson, for appellee.

## OPINION

HOWARD, Judge.

The issue here is whether the trial court erred in granting a motion to suppress the evidence. Appellee contended below that the search warrant was invalid. The trial court agreed. So do we, and affirm.

On November 7, 1976 the body of Richard Johnson was discovered in Pima County, Arizona. Investigation of the homicide revealed that turquoise jewelry had been taken from the victim's home. Later in the same month, appellee visited his cousin, Jearol Claxton, who was then living in Hood River, Oregon. Unbeknownst to appellee, Jearol had been working for several years with the Phoenix police as a paid informant in drug cases. He had proven to be a reliable informant. Appellee had two black jewelry cases filled with turquoise jewelry that he showed to Jearol and Jearol's sister. He told them that he wanted to sell the jewelry. At one point, while they were in Oregon, appellee appeared angry and nervous and told Jearol that a "faggot and pervert" had been tied and strangled and that he could not understand why the police were after him because he had done the state a favor. Appellee also mentioned "Arizona", "Tucson Jewelry Store", as well as a person named "Sanchez". Jearol called

Detective Smith of the Phoenix Police Department, told him about the jewelry and what appellee had related to him. Detective Smith contacted Detective Sullivan of the Pima County Sheriff's Department. Sullivan obtained some photographs of the stolen jewelry from a Ruben Sanchez and flew to Oregon to meet Jearol and another person to whom appellee had sold a piece of the turquoise jewelry. After the meeting, Jearol and Sullivan flew to Phoenix to meet Det. Smith.

In the meantime, appellee had gone to Phoenix. The day after Jearol and Det. Sullivan arrived in Phoenix, Jearol saw the same black jewelry cases in the camper on the back of appellee's truck, which was parked near a gas station. Jearol telephoned Det. Smith who went to where the truck was parked. He could see the jewelry cases when he looked through the windows of the camper.

Later that day the detectives instructed Jearol to obtain some of the jewelry so they could compare it with the photographs. Jearol met appellee and told him that he had a "fence" who might buy the jewelry. Appellee, who was now storing the jewelry cases in the trunk of a silver Pontiac Grand Prix, gave both cases to Jearol. Jearol then took some of the pieces to the police station. Comparison with the photographs proved the jewelry belonged to the murder victim.

The police instructed Jearol to return the jewelry to appellee while they obtained a search warrant. Jearol telephoned appellee's girlfriend and determined that appellee was at her house. He left the police station at 10:30 p. m. accompanied by a policeman who was to drop him off so he could get the rest of the jewelry and return it to appellee. Jearol arrived at the residence of appellee's girlfriend at approximately 11:30 p. m. About one to one and a half hours later he gave the jewelry back to appellee, who placed the cases back in the trunk of the silver Pontiac Grand Prix.

After Jearol left the police station, Dets. Smith and Sullivan typed up a search warrant and a supporting affidavit. They went to the home of a Maricopa County Superior Court Judge, arriving at approximately 11:30 p. m. Det. Smith, who was the affiant, was sworn and a search warrant was issued. The affidavit stated, inter alia:

"Your affiant learned from a confidential and reliable informant the following information. That the informant learned from the informant's own personal observations that Richard William Claxton, W/M, 8–18–47, 6'1", 247#, brown hair, brown eyes, *is in possession of a large quantity of turquoise jewelry approximately $20,000.00 in value,* contained in two large black carrying cases approximately one foot by one and one half feet by one and one half feet (1' × 1½' × 1½') that was taken in a Tucson, Arizona homicide. Also, that Richard William Claxton, W/M, 8–18–47, described above, *is in possession of the turquoise jewelry on his person and in his vehicle* described as a new model Pontiac Gran Prix, 2-door, silver in color, with red interior with black tire marks on the left rear fender possibly from an accident, license number TWF–756 (AZ), registered on 1976 Pontiac, to Pontiac Motor Division. * * *" (Emphasis added)

The detectives then drove to the girlfriend's residence and began a surveillance of the house and the Pontiac automobile. Two other police units were involved in the stakeout which began in the early morning hours of December 1, 1976. The police were concerned because a woman and two children were in the residence. They wanted to wait for them to leave before they executed the search warrant, and intended to make a "street jump" when appellee left the residence and attempted to get into the Pontiac. Between 8:15 and 8:35 a. m. the woman and two children departed. At 9:18, the police observed appellee leave the residence and go to the Pontiac. The police were moving in when appellee saw them and started to run. A shootout ensued, and appellee remained "holed up" for six to eight hours in the house before surrendering to the police.

After appellee surrendered, the police searched the trunk of the Pontiac described

in the warrant and found the two black jewelry cases that contained the stolen turquoise jewelry.

It was appellee's contention below that the above-quoted statements contained in the warrant affidavit were deliberate falsehoods because Jearol had not yet returned the jewelry to appellee when the affidavit was executed.

The issue in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) was whether a defendant can challenge the truthfulness of factual statements in an affidavit supporting a warrant. The Court held that the trial court must grant a hearing on a motion to suppress when the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit, and if the allegedly false statement is necessary to the finding of probable cause. It further held that if the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and if, with the affidavit's false material eliminated, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if on its face the affidavit lacked probable cause. The Court also specifically held that the only deliberate falsity or reckless disregard which may be impeached is that of the affiant and not of any non-governmental informant.

The meaning of the phrase "false statement made knowingly and intentionally, or with reckless disregard for the truth," which appears in *Franks,* can be gleaned from the Court's statement that the Fourth Amendment requires a factual showing sufficient to comprise probable cause and that the assumption is obvious that there must be a truthful showing. The Court then stated:

"This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." 98 S.Ct. at 2681.

The facts of *Franks* give us an example of an intentional and knowing false statement. There the affidavit stated that the affiants contacted a Mr. Morrison and a Mr. Lucas and had a personal conversation with them. It went on to recite what these gentlemen told them. At the hearing on the motion to suppress, the defendant's attorney stated to the court that if he were permitted to call Mr. Morrison and Mr. Lucas, they would testify that they had not been personally interviewed by the affiants. Thus we have the affiants making statements under oath which they knew were not true.

The same type of falsehood appears in *State v. Payne,* 25 Ariz.App. 454, 544 P.2d 671 (1976). There, the warrant affiant stated that the informant personally observed narcotics in the possession of the defendant. The affiant later admitted that the informant did not tell him that he saw the defendant with the drugs.

Here the affiant testified at the motion to suppress that when he swore to the truthfulness of the affidavit he did not know whether the jewelry had been returned. He said that at best, there was only a possibility that the jewelry was back in appellee's possession.

■ Were Det. Smith's statements in the warrant affidavit knowingly and intentionally false, or made with reckless disregard for the truth, when there was only a possibility that they might be true? We believe they were. To hold otherwise would be to ignore the requirements of probable cause and truthfulness.

■ Disregarding the false statements, the affidavit's remaining contents do not establish probable cause. The state contends that even if the warrant was invalid, there are other grounds which provide a basis for upholding the search. The prob-

lem with this contention is that these grounds were never presented to the trial court. Citing the cases of *State v. Sardo,* 112 Ariz. 509, 543 P.2d 1138 (1975) and *State v. Dugan,* 113 Ariz. 354, 555 P.2d 108 (1976), the state claims it can still rely on these different theories. The state's reliance on these cases is misplaced. They stand for the proposition that on appeal the trial court's judgment will be *affirmed* on any grounds which were within the issues. In other words, we will affirm the trial court if it was correct, even though it was correct for the wrong reason. But this rule cannot be used to *reverse* the trial court. When a party is seeking to reverse the trial court it cannot rely on an issue not raised below. Cf. *State v. Winters,* 27 Ariz.App. 508, 556 P.2d 809 (1976). The reason is obvious. One cannot claim the trial court erred in rejecting a theory if the theory was never presented to it. The state thus has no basis for alleging error on these grounds.

Affirmed.

RICHMOND, C. J., and HATHAWAY, J., concurring.