686 P.2d 750

**STATE of Arizona, Appellee,**

v.

**James Clifford FISHER, Appellant.**

**No. 5611.**

Supreme Court of Arizona,
In Banc.

June 14, 1984.

Reconsideration Denied July 17, 1984.

---

Robert K. Corbin, Atty. Gen., William J. Schafer, III, Chief Counsel, Crim. Div., Linda A. Akers, Asst. Attys. Gen., Phoenix, for appellee.

Thornton W. Price, III, Phoenix, for appellant.

GORDON, Vice Chief Justice:

This is an appeal from a conviction of murder in the first degree, A.R.S. § 13–1105, for which defendant, James Fisher, has been sentenced to death. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 13–4031.

The body of Marguerite Bailey was discovered in an alley in the early morning hours of Sunday, September 13, 1981. Her car was found that evening in the parking lot of Uptown Plaza at Central Avenue and Camelback Road in Phoenix. On September 14, Sergeant Dennis Keith and Detective Larry Jennings of the Phoenix Police Department went to Bailey's condominium in search of investigative leads. While there, Sgt. Keith answered a telephone call from Curtis Griffith. Griffith was the Fishers' friend and neighbor, and a tenant at 716 E. Turney, the apartment complex owned by Bailey and managed by the defendant. Griffith was calling Bailey to ask her if she knew where the defendant and his wife, Ann Fisher, were. When Sgt. Keith told him that Bailey had been murdered over the weekend, he became alarmed. In response to Griffith's concern for the safety and well-being of the Fishers, Sgt. Keith and Det. Jennings entered the Fishers' apartment. Based on what they saw at that time, they obtained a search warrant and seized evidence that was introduced at trial.

On September 17, defendant and his wife were arrested at his mother's home in Davenport, Iowa by Detective Kenneth Rexroth of the Moline (Illinois) Police Department and Detective Ron VanFossen of the Davenport Police Department. Interrogation by the two officers produced a statement by Ann Fisher, inculpating the defendant, and a statement by the defendant.

The defendant made a pre-trial motion requesting suppression of the physical evidence removed from his home on September 14 and of the confession made on September 17 on the grounds that they were obtained pursuant to a warrantless, illegal search. The motion was denied.

On April 28, 1982, a jury found defendant guilty of first degree murder. He was sentenced to death. Defendant raises the following issues on appeal:

(1) Did the trial court err in denying defendant's motion to suppress?

(2) Did the trial court err by admitting a handwritten map and a rent receipt book found in defendant's apartment?

(3) Did the trial court abuse its discretion in refusing to admit into evidence two letters written by Ann Fisher to defendant?

(4) Did the trial court err in failing to admit the plea agreement between Ann Fisher and the state?

(5) Did the trial court erroneously admit evidence of the victim's habit of carrying large sums of money?

(6) Was defendant denied a fair trial by the introduction of evidence concerning the victim's bank account through the testimony of an undisclosed witness?

(7) Did the trial court err in refusing to instruct the jury on the crimes of negligent homicide and hindering prosecution?

(8) Did the trial court violate Ariz. Const. art. 2, § 12 by excusing two jurors who told the court they could not be fair and impartial because of their religious beliefs?

(9) Was the death penalty proper given the fact that a venire member with scruples against the death penalty had been excused?

(10) Did the trial court err in denying defendant's motion for a new trial based on Ann Fisher's post trial confession?

(11) Was the death penalty properly imposed?

## SUPPRESSION OF THE EVIDENCE

The defendant challenges the trial court's denial of his motion to suppress the physical evidence seized from his apartment on the grounds that the initial warrantless entry violated his fourth amendment right to privacy. In response, the state claims that the trial court's denial was proper on one of the following grounds: (1) defendant lacked standing to challenge entry into his apartment because he had abandoned it; (2) "exigent circumstances" justified the entry; (3) the entry was a good faith welfare check; and (4) even if the entry did not satisfy the requirements of the fourth amendment, the fact that the evidence would have been inevitably discovered justified its admission.

■ It is well established in this state that a trial court's ruling on a motion to suppress will not be disturbed absent a clear abuse of discretion. *State v. Adamson*, 136 Ariz. 250, 665 P.2d 972, *cert. denied*, —— U.S. ——, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983); *State v. Ferreira*, 128 Ariz. 530, 627 P.2d 681 (1981).

■ Though the trial court did not include in the record its reasons for denying the defendant's motion to suppress, we affirm its decision.[1] We find that the police officers' initial entry and survey of defendant's apartment for persons in need of aid was reasonable, that their subsequent search of the apartment and seizure of evidence was proper, and that the defendant cannot claim a right to privacy in the evidence seized because he had abandoned it.

■ The fourth amendment to the United States Constitution provides that "The right of the people to be secure in their persons, houses, papers, and ef-

1. In failing to indicate the grounds on which it denied defendant's motion to suppress, the trial court has, intentionally or not, significantly added to this Court's appellate burden. We strongly urge trial courts to include in the record the reasons for their decisions so that appellate courts may review those decisions in a more directed and efficacious manner.

fects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Warrantless searches are *per se* unreasonable under this amendment, subject only to a few specifically established, "jealously and carefully drawn" exceptions. *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514, 1519 (1958); *see Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The burden is on the party seeking the exemption to show the need for it. *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *State v. Wright,* 125 Ariz. 36, 607 P.2d 19 (App.1979). Because physical entry of one's home is the chief evil against which the fourth amendment is directed, *Payton, supra,* any invasion into the privacy of the home must be given careful scrutiny. *State v. Martin,* 139 Ariz. 466, 679 P.2d 489 (1984); *State v. Warren,* 121 Ariz. 306, 589 P.2d 1338 (1978).

■ The emergency aid exception to the warrant requirement, which provides that officers of the state may enter a dwelling without the benefit of a warrant where they reasonably believe there is someone within in need of immediate aid or assistance, has been recognized by numerous state and federal courts. *See Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) and cases cited therein; *State v. Mincey,* 130 Ariz. 389, 636 P.2d 637 (1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982); *State v. Wright, supra; People v. Reynolds,* Colo., 672 P.2d 529 (1983); *United States v. Booth,* 455 A.2d 1351 (D.C.App.1983); *People v. Mitchell,* 39 N.Y.2d 173, 347 N.E.2d 607, 383 N.Y.S.2d 246, *cert. denied,* 426 U.S. 953, 96 S.Ct. 3178, 49 L.Ed.2d 1191 (1976); *State v. Jones,* 45 Or.App. 617, 608 P.2d 1220 (1980). This exception is justified, if not required, by the fact that "the preservation of human life is paramount to the right of privacy protected by search and seizure laws and constitutional guaranties [sic]," *Patrick v. State,* 227 A.2d 486, 489 (Del.1967); *Johnson v. State,* 386 So.2d 302 (Fla.App.1980); *see also People v. Mitchell, supra.* Because it is not unreasonable for police to enter a dwelling for the purpose of providing emergency aid or assistance, such entries are not proscribed by the fourth amendment. *Mitchell, supra.* Furthermore, "[t]he right of the police to enter [a dwelling] and investigate in an emergency * * * is inherent in the very nature of their duties as peace officers," *United States v. Barone,* 330 F.2d 543, 545 (2d Cir.), *cert. denied,* 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964); *see also* A.B.A. Standards for Criminal Justice § 1–2.2 (1982). Several courts, including our Court of Appeals, have recognized a general obligation of police officers to assist persons whom they reasonably believe are in distress. *State v. Sainz,* 18 Ariz. App. 358, 501 P.2d 1199 (1972); *People v. Gallmon,* 19 N.Y.2d 389, 227 N.E.2d 284, 280 N.Y.S.2d 356 (1967), *cert. denied,* 390 U.S. 911, 88 S.Ct. 832, 19 L.Ed.2d 884 (1968). *Austin v. Scottsdale,* 140 Ariz. 579, 684 P.2d 151 (1984) [1984].

■ Whether a warrantless entry was justified under the emergency aid exception is difficult for a court, detached from the on-the-scene pressures and emotions, to determine. In an effort to provide guidance for the courts of New York, the New York Court of Appeals has set forth the following as basic facts which a court must find in order to uphold a search based on the exception:

"(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

"(2) The search must not be primarily motivated by intent to arrest and seize evidence.

"(3) There must be some reasonable basis, approximating probable cause, to

associate the emergency with the area or place to be searched."[2]

*Mitchell, supra,* 39 N.Y.2d at 177–178, 347 N.E.2d at 609, 383 N.Y.S.2d at 248.[3] The reasonableness of a police officer's response in a given situation is a question of fact for the trial court. Its ruling will not be disturbed on appeal absent clear and manifest error. *See State v. Boyer,* 106 Ariz. 32, 470 P.2d 439 (1970); *State v. Lloyd,* 61 Hawaii 505, 606 P.2d 913 (1980). Because there is sufficient evidence on the record from which the trial court could have found each of these facts in the instant case, we find no abuse of discretion in its denial of the motion to suppress.

### Reasonable Grounds To Believe There Was An Emergency

The facts known to Sgt. Keith and Det. Jennings made it reasonable for them to believe there was an emergency at hand that demanded their immediate intervention. While searching Bailey's home for investigative leads on Monday, September 14, the officers received a phone call from Curtis Griffith. Griffith was calling Bailey to inform her that the Fishers, the managers of her apartment complex, had not been at their apartment for at least 39 hours. He told Sgt. Keith that he was concerned about them because they were "usually around" and because there had been a note on the door of their apartment since approximately 3:00 p.m. on Saturday that said "I will return around 8:00 p.m. Jim." When the officers told Griffith that Bailey had been murdered over the weekend, he became more alarmed and indicated that he would like them to come to the apartment complex to "check on things." Upon arriving at the complex, the officers spoke with Griffith again; he reasserted his concern and asked them to enter the Fishers' apartment. Sgt. Keith and Det. Jennings investigated the area for approximately forty-five minutes after which Sgt. Keith, using a passkey taken from Bailey's condominium, entered the apartment.

 Defendant points to the forty-five minute delay as proof that the officers did not, in fact, believe an emergency existed. Though this inference is a reasonable one, it is not the only reasonable one. Sgt. Keith and Det. Jennings were in a very difficult position; they knew a woman had been murdered and that the employee she had purportedly gone to collect rent from shortly before she was killed was missing. The trial court could reasonably have inferred that the delay was due to the police officers' reluctance to make a warrantless entry absent good reason to believe there was an emergency. The forty-five minute delay does not, in and of itself, belie the police officers' assertion that they believed an emergency was at hand. *See United States v. Jones,* 635 F.2d 1357, 1361 (8th Cir.1980) (entry to give aid not suspect due to one hour delay where police spent the hour "busily engaged in solving the problem"); *State v. Monroe,* 101 Idaho 251, 611 P.2d 1036 (1980), *vacated,* 451 U.S. 1014, 101 S.Ct. 3001, 69 L.Ed.2d 385 (1981), *on remand,* 103 Idaho 129, 645 P.2d 363 (1982) (entry not suspect due to one hour delay where hour was spent gathering facts and preparing for entry). Police officers must not be doubted because they exercise caution and take the time to evaluate the need for a warrantless entry. Were we to hold otherwise, we would encourage precipitous and hasty entries and discourage pre-entry investigation and reflection.

 Likewise, Sgt. Keith's statement at the suppression hearing that his purpose in entering was "to make sure there wasn't another body in there or some other problem we needed to address" does

---

**2.** For analogous standards *see Booth, supra; Gallmeyer v. State,* 640 P.2d 837 (Alaska App. 1982).

**3.** In *Mitchell,* the police had entered the defendant's hotel room during a floor-wide search for a hotel chambermaid who had disappeared several hours earlier. They noticed reddish brown stains on the bedding, rug, and bathroom wall and, upon opening the closet door, found a blood-soaked laundry basket that contained a hatchet and the corpse of the missing woman. Applying the standard set forth above, the court upheld the search.

not require rejection of the claim that he entered the apartment to provide emergency aid. An entry and search for other possible homicide victims falls within the emergency aid doctrine, *State v. Crews*, 66 N.C.App. 671, 311 S.E.2d 895 (1984). In recognition of the fact that "[f]requently, the report of a death proves inaccurate and a spark of life remains," the Delaware Supreme Court has stated that "[a]s a general rule, we think, an emergency may be said to exist, within the meaning of the 'exigency' rule, whenever the police have credible information that an unnatural death has, or may have, occurred." *Patrick, supra*, at 489. We agree. Though the police in the instant case admittedly had no clear reason to believe that whoever had killed Bailey had also gone into the Fishers' apartment and done the same to them, the police had credible information that made it reasonable for them to conclude that there may have been victims in the Fishers' apartment whose lives could be saved.

### Officers' Motive

With respect to the second basic fact enumerated in *Mitchell, supra*, there is ample evidence from which the trial court could have found that the police officers' primary, if not sole, motive in entering the apartment was to check on the welfare of the Fishers. Sgt. Keith stated at the suppression hearing that at the time he entered the apartment the Fishers were not suspects in the murder of Bailey and that he had no reason to believe Bailey had been killed in their apartment. He also said he was "surprised" when he saw evidence in the apartment implicating them in the murder. When asked if the only reason for entering the apartment was to check on the Fishers' welfare, he responded affirmatively.

The United States Supreme Court has stated that a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio*, 392 U.S. 1, 26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889, 908 (1968). Where the police actions exceed those necessary to meet the exigencies, assertions that they were motivated by the exigencies alone must be strictly scrutinized. *See United States v. Goldenstein*, 456 F.2d 1006 (8th Cir.1972), *cert. denied sub nom. Ray v. United States*, 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974); *Crews, supra*. Here, the police officers' actions upon entering the apartment were consistent with their asserted purpose in entering; they surveyed the bedroom/living room, kitchen, and bathroom; they checked the shower "to make sure there wasn't another body." They then left the apartment. Sgt. Keith guessed they were in the apartment for no more than two minutes. Their actions were clearly circumscribed by the exigencies that justified the intrusion.

Based on what they saw in the apartment, Sgt. Keith and Det. Jennings sought and obtained a search warrant. Only then did they conduct a thorough search of the apartment and seize evidence relevant to the murder of Bailey. The fact that the search warrant was based on what they saw in plain view during the initial entry and survey does not render the search or seizure invalid. Because they were lawfully in the apartment, anything in plain view was subject to immediate seizure or use as grounds for a search warrant. *See Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *State v. Mata*, 125 Ariz. 233, 609 P.2d 48, *cert. denied*, 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980).

### Reasonable Grounds To Associate Emergency With Defendant's Apartment

Finally, the record provides an adequate basis from which the trial court could have found it reasonable for the police to enter the Fishers' apartment in search of them. When the police entered the apartment, they did not know the Fishers had left for Iowa and Illinois. All the police knew was that Bailey had been murdered sometime after she had purportedly gone to their apartment to collect the rent and that the

Fishers had not responded to notes left on their door or attempts to summon them in their apartment for at least as long as Bailey had been dead. Griffith had connected Bailey's murder with the Fishers' disappearance. The police could reasonably have believed the Fishers had come to harm in their apartment and that the note on the door had been left to avert suspicion.

■ Because the trial court could reasonably have found that the police officers' action in entering defendant's apartment fell within the emergency aid exception to the warrant requirement under *Mitchell, supra,* we find no abuse of discretion in its denial of defendant's motion to suppress. The exclusionary rule "is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561, 571 (1974). Because a search conducted pursuant to the emergency aid exception is not unreasonable under the fourth amendment and because we do not want to deter police officers from engaging in searches for persons in distress, the exclusionary rule has no place here.

■ We note that the exigent circumstances exception to the warrant requirement, urged by the state as a justification for the warrantless entry, does not apply here. Because that exception is often confused with the emergency aid doctrine, we address them both in order to explain the fundamental distinction between them. Though both doctrines could justify a warrantless entry in a given factual setting, the nature of the circumstances that prompt the entry and the presence or absence of probable cause sufficient to obtain a search warrant determine which doctrine will apply.

■ The exigent circumstances exception is triggered when the police, with probable cause but no warrant, enter a dwelling in the reasonable belief that the delay necessary to obtain a warrant threatens the destruction of evidence, *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *United States v. Rubin,* 474 F.2d 262, *cert. denied sub nom. Agran v. United States,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); *State v. Lloyd, supra,* or when they have a reasonable belief that a crime is in progress or has just been committed in a dwelling and the delay attendant to obtaining a warrant endangers the safety or life of a person therein. *See State v. Sainz, supra* (exigent circumstances justified entry where it was prompted by phone call from a woman informing police that her son was chasing her with a knife); *People v. Hill,* 12 Cal.3d 731, 755, 528 P.2d 1, 20, 117 Cal.Rptr. 393, 412 (1974) *overruled in part on other grounds* in *People v. DeVaughn,* 18 Cal.3d 889, 558 P.2d 872, 135 Cal.Rptr. 786 (1977) (exigent circumstances justified entry where police reasonably believed the shooting that had recently occurred and seriously wounded one person might have resulted in other casualties; "the delay incidental to obtaining a search warrant could have resulted in the unnecessary loss of life."); *see also Johnson v. State, supra.* The exigencies of the circumstances justify the failure to obtain the warrant that could have been obtained.

■ Conversely, the emergency aid doctrine is triggered when the police enter a dwelling in the reasonable, good-faith belief that there is someone within in need of immediate aid or assistance. In cases in which this doctrine applies there is no probable cause which would justify issuance of a search warrant, *see* A.R.S. §§ 13–3912, –3913, and the police are not entering to arrest, search, or gather evidence. The need to ensure the safety and well-being of the public, rather than the need to ensure the preservation of evidence, justifies the warrantless entry.

In the instant case, Sgt. Keith specifically stated that he lacked probable cause to obtain a warrant to enter and search the Fishers' apartment. His belief that the Fishers might have come to harm within

did not rise to the level of probable cause sufficient to secure a search warrant. The entry. into the apartment is justified by the emergency aid doctrine; the exigent circumstances exception simply does not apply.

## ABANDONMENT

 Finally, the trial court could have found the defendant lacked standing to challenge seizure of evidence obtained in the apartment. Though the defendant claimed he had left Phoenix for a short visit with his family in Iowa and Illinois, there is substantial evidence in the record from which the trial court could have found that he abandoned it with no intent to return. At the suppression hearing, defendant was not sure if he had informed Bailey of his intent to leave. Griffith, who apparently spent a good deal of time with the defendant and called upon him to perform managerial tasks, knew nothing of the "planned" trip. Finally, the fact that defendant had purchased a car in the early evening of September 12 and left Phoenix shortly thereafter casts doubt on his statement that he had planned the out-of-state trip several months earlier. The trial court could reasonably have concluded that the defendant had, in fact, made a sudden decision to leave Phoenix permanently with no intent to return to his apartment. The fact that the Fishers had taken their clothes and the television Bailey had given them supports this conclusion. Because one cannot claim a reasonable expectation of privacy in a place or thing one has abandoned, *State v. Myers*, 117 Ariz. 79, 570 P.2d 1252 (1977), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978); *State v. Childs*, 110 Ariz. 389, 519 P.2d 854 (1974), a person who has voluntarily abandoned his or her property lacks standing to object to a search or seizure of it. *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *State v. Walker*, 119 Ariz. 121, 579 P.2d 1091 (1978). If the court denied defendant's motion to suppress based on a finding that defendant lacked standing to object, it did not abuse its discretion.

## ADMISSION OF POST–ARREST STATEMENT

 Defendant's challenge to the admission of his post-arrest statement as "fruit of the poisonous tree," *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), must also fail. Because the initial entry and search of the apartment, as well as the subsequent seizure of evidence linking the defendant to the murder of Bailey, was proper, any evidence obtained as a result thereof was admissible. We find no error.

## ADMISSION OF HANDWRITTEN ITEMS

The defendant specifically challenges the admission of a handwritten map and rent receipt book found in his apartment. He claims they were not sufficiently authenticated as required by Ariz.R.Evid. 901(a). We will consider each item individually.

### *Map*

 The map at issue was a rough sketch showing the intersections of Camelback Road with both Central Avenue and Seventh Street in Phoenix and the location of Uptown Plaza where Bailey's car was found. Defense counsel objected to its admission. He stated that the map was only relevant if it had been drawn by the defendant or his wife and, since no evidence of authorship had been introduced, it was inadmissible. The state replied that, because the map was found in the defendant's apartment, it was relevant, regardless of who had drawn it, to show that the defendant could have driven Bailey's car to Uptown Plaza. The state claimed the authorship affected the weight rather than the admissibility of the map. The court agreed with the state and the map was admitted.

Ariz.R.Evid. 901(a) provides that:

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

The state claimed the map was a sketch showing how to get from the defendant's apartment on Seventh Street to Uptown Plaza. Defendant erroneously believed the state proffered the map as the creation of one of the Fishers and that it would only be relevant if that were true. We find no abuse of discretion in the court's determination that the map was what its proponent claimed or in its decision to admit the map; we will not disturb its ruling. *See State v. Emery,* 141 Ariz. 549, 688 P.2d 175 (1984).

### Rent Receipt Book

Defense counsel made a similar objection to the admission of a rent receipt book found in defendant's apartment. The book contained carbon copies of rent receipts issued to tenants of 716 E. Turney upon payment of their rents. Copies of receipts numbered 7001 through 7055 were marked with the initials "MB" whereas receipts 7056 through 7064, the last receipts written, had not been so marked. The state sought to use this evidence to support its claim that the defendant killed Bailey for the rent money he had collected for her. Defense counsel argued that the book was inadmissible because the state had not proffered any evidence to show that the initials were written by Bailey. The state replied that Ariz.R.Evid. 901(a) was satisfied by a Phoenix Police Department detective's identification of it as the rent receipt book removed from a desk in defendant's apartment. The court agreed with the state, stating that defense counsel's objection affected the weight rather than the admissibility of the evidence. We find no abuse of discretion.

### ADMISSIBILITY OF LETTERS FROM ANN FISHER TO DEFENDANT

At trial, defendant moved to admit into evidence two letters written by Ann Fisher to the defendant on the grounds that they were either prior inconsistent statements, Ariz.R.Evid. 801(d)(1)(A), or statements against Ann Fisher's penal interest, Ariz.R.

Evid. 804(b)(3). The trial court excluded the letters based on its knowledge that Ann Fisher would, if called to testify, assert her fifth amendment privilege and refuse to answer any question dealing with the letters.

Admission of evidence is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Williams,* 132 Ariz. 153, 644 P.2d 889 (1982); *State v. Macumber,* 119 Ariz. 516, 582 P.2d 162, *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). *See United States v. Satterfield,* 572 F.2d 687 (9th Cir.), *cert. denied,* 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978). We find that the trial court did not abuse its discretion in excluding Ann Fisher's letters.

Ariz.R.Evid. 801(d)(1)(A) provides that: "A statement is not hearsay if * * * [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is inconsistent with his testimony * * *."

This rule does not apply here because the declarant, Ann Fisher, did not testify at trial concerning her statement to police officers in Iowa. Any statements inconsistent with her earlier statement were hearsay and only admissible pursuant to an exception to the hearsay rule.

Ariz.R.Evid. 804(b) provides that "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* \* \* \*

"(3) *Statement against interest.*

"A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liabili-

ty and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

 Defendant argues that Ann Fisher was only "unavailable" because the state encouraged, if not induced, her to claim her fifth amendment privilege against self-incrimination. Defendant says the state should have granted Ann Fisher immunity and that its failure to do so violated his sixth amendment right to confront witnesses against him.[4] We hold that Ann Fisher was unavailable pursuant to Ariz.R. Evid. 804(a)(1) and that the state was not required to grant her immunity.

 There is no sixth amendment right to have a witness testify if the witness claims a valid privilege. *United States v. Turkish,* 623 F.2d 769 (2d Cir. 1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); *State v. Jeffers,* 135 Ariz. 404, 661 P.2d 1105, *cert. denied,* — U.S. ——, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983). A defendant's desire that a witness testify does not override the witness' fifth amendment right to claim the privilege against self-incrimination. *See State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983); *State v. Axley,* 132 Ariz. 383, 646 P.2d 268 (1982). Defendant did not have a right to have Ann Fisher testify at his trial if she voluntarily chose to claim her fifth amendment right.

 It is clear in Arizona that the state has no obligation to grant immunity to a witness. Instead, "[i]t is a matter of prosecutorial discretion to decide when the public interest would be served by a grant of immunity." *State v. Axley, supra,* at 388, 646 P.2d at 273; *State v. Verdugo,* 124 Ariz. 91, 602 P.2d 472 (1979); *State v.*

*Cookus,* 115 Ariz. 99, 563 P.2d 898 (1977); A.R.S. § 13-4064. As we concluded in *State v. Buchanan,* 110 Ariz. 285, 289, 518 P.2d 108, 112 (1974), and reiterated in *State v. Axley, supra,* 132 Ariz. at 388, 646 P.2d at 273:

"Faced with a claim of the privilege against self-incrimination there is nothing in the Fourteenth Amendment which gives a criminal defendant the right to have immunity granted to the witness."

In *State v. Axley* we considered the Third Circuit's contentions that due process may require the government to request immunity for a defense witness where that witness' decision to claim the fifth amendment was caused by prosecutorial misconduct, *United States v. Morrison,* 535 F.2d 223 (3d Cir.1976), and that a court has inherent authority to immunize a witness when the witness would offer "clearly exculpatory" and "essential" testimony and the government has no strong interest in withholding use immunity, *Government of the Virgin Islands v. Smith,* 615 F.2d 964, 972 (3d Cir.1980). We noted that "[t]here is no violation of the right to compulsory process when the unavailability of the witness has not resulted from the suggestion, procurement, or negligence of the government," *State v. Axley, supra,* 132 Ariz. at 388, 646 P.2d at 273, and held that the government's failure to give the defense witness immunity did not violate the defendant's due process rights because the witness' decision to assert the fifth amendment was clearly not induced by prosecutorial misconduct. The instant case is more complicated. Here, defendant claims he was denied his constitutional right to compulsory process and a fair trial because the witness, Ann Fisher, only asserted her fifth amendment right, and thereby became una-

---

4. Though she did not testify against defendant at his trial, Ann Fisher was a witness against him because her statement to police officers in Iowa on September 17, 1981, in which she essentially condemned defendant for the premeditated murder of Bailey, was admitted. We note that the statement was admitted at defendant's request with his express knowledge and understanding that he would not be able to compel his wife's testimony with respect to it. Having made a strategic decision to admit his wife's statement to support his assertion that his confession was merely a reassertion of hers made to shield her from suspicion, defendant is estopped from arguing that his sixth amendment rights were violated because he could not cross-examine her with respect to that statement.

vailable, in order to secure the benefits of a plea agreement. We need to determine if that allegation is true, and, if it is, whether the offer of the plea agreement constitutes prosecutorial misconduct.

 Though. the plea agreement here is unusual, if not unethical, we find that Ann Fisher's decision to assert the fifth amendment was not necessarily procured by it. The agreement stated that upon termination of the guilt stage of defendant's trial, Fisher would be permitted to plead guilty to hindering prosecution, a class five felony, if certain conditions were met. The condition relevant here provided that "if she is called as a witness in the trial of James Fisher and required to testify, her testimony will not vary substantially in relevant areas to statements previously given * * *." Given the United States Supreme Court's pronouncement on plea bargaining in *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed. 604 (1978), we find that the threat associated with this provision of the plea agreement, namely, that she would lose the bargain if she chose to testify at James Fisher's trial and her testimony was inconsistent with her statements in Iowa, did not compel Ann Fisher's decision to be unavailable. Though it is possible that Ann Fisher chose not to testify to secure the benefits of the plea agreement, it is equally possible that she chose not to testify to avoid self-incrimination. Because the trial court could reasonably have found that Ann Fisher's reason for not testifying was the latter, we do not disapprove of its decision not to compel the state to grant Ann Fisher immunity.

Given this disposition of defendant's argument, we need not determine if the plea agreement constitutes prosecutorial misconduct under *Morrison, supra.*[5]

 Furthermore, the conditions recognized in *Virgin Islands, supra,* as sufficient to trigger a court's inherent authority to immunize a witness are not present here. Defendant presented no evidence that Ann Fisher, if immunized, would offer evidence that was clearly exculpatory and essential to the defense's case, and the state had a valid interest for withholding immunity because Ann Fisher was subject to prosecution for the same murder for which defendant was being tried. *See State v. Axley, supra* (fact that co-defendant had the right to appeal his conviction gave state valid interest in withholding immunity). Neither the state nor the trial court was required to grant Ann Fisher immunity. Ann Fisher was validly unavailable.

 Having established Ann Fisher's unavailability, the question becomes whether the letters were statements against her interest. Ariz.R.Evid. 804(b)(3). Though we do not construe Ariz.R.Evid. 804(b)(3) to say that only direct confessions are sufficiently against penal interest, *United States v. Barrett*, 539 F.2d 244 (1st Cir. 1976), we do read the rule to require that the statement to be introduced implicate the declarant in a crime. In the instant case, Ann Fisher's letters are not against her penal interest. In the letter dated January 11, 1982, Ann Fisher informed the defendant that "[i]t was someone else who lived in the apt. complex who killed her. * *

---

5. Though we need not determine the validity of this agreement, we do question its propriety. We recognize the benefits to be gained from granting a defendant immunity in exchange for truthful testimony, *see State v. McDaniel, supra,* and for granting plea bargains in the interest of judicial economy. The instant case involves more than that. The prosecution did not condition conviction for a lesser offense on a defendant's promise to tell the truth. Instead, the prosecution conditioned conviction for a lesser offense on a defendant's promise to be consistent. By doing so, the prosecution may have overstepped the bounds of the law and its ethical responsibility to "scrupulously avoid any suggestion calculated to induce the witness to suppress or deviate from the truth, or in any degree to affect his free and untrammeled conduct when appearing at the trial or on the witness stand." A.B.A. Canons of Professional Ethics 39. We remind the prosecution that a public prosecutor's duty is "to seek justice, not merely to convict" and that a public prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage his case or aid the accused. A.B.A. Model Code of Professional Responsibility, Ethical Consideration 7–13.

Jim, you *didn't Kill* Mrs. Bailey!" (emphasis in original). At no time did she admit any involvement in the murder. The letter does not fall within this exception to the hearsay rule.

In the letter dated April 20, 1982, the second day of defendant's trial, Ann Fisher wrote: "If, for any reason, I have to take the stand, I will confess, because I've already told you, I love you." Again, she did not implicate herself in the murder of Bailey. She simply said she would confess because she loved the defendant and did not want to see him incarcerated. This letter, like the first, is beyond the scope of Ariz.R.Evid. 804(b)(3). Because we find that Ann Fisher's letters are not against her penal interest, nor within any other exception to the hearsay rule, *see* Ariz.R. Evid. 803–804, we need not consider whether the trial court's reason—that exclusion was required because the declarant, Ann Fisher, would not testify with respect to them if called at trial—is correct. Since exclusion was proper, we uphold the trial court. It is our duty to affirm a trial court's ruling provided the result is legally correct. *State v. Dugan*, 113 Ariz. 354, 555 P.2d 108 (1976); *State v. Claxton*, 122 Ariz. 246, 594 P.2d 112 (App.1979).

### ADMISSIBILITY OF PLEA AGREE-
### MENT BETWEEN ANN FISHER
### AND THE STATE OF ARIZONA

Defendant challenges the trial court's refusal to admit into evidence the plea agreement between the state and Ann Fisher. We find exclusion was proper.

A fundamental requirement for admission of any evidence is that it be relevant. Ariz.R.Evid. 402. To be relevant, evidence must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or. less probable than it would be without the evidence." Ariz.R. Evid. 401.

A plea agreement is relevant to impeach a witness' testimony. Since the

witness, Ann Fisher, informed the trial judge that she would not testify concerning any facts of consequence to the determination of whether James Fisher committed the murder of Bailey, the plea agreement had no relevance. It was, therefore, properly excluded.

### ADMISSIBILITY OF EVIDENCE OF
### VICTIM'S HABIT OF CARRYING
### LARGE SUMS OF MONEY

In pre-trial communications with the defense, the state indicated its intent to establish a motive for the murder by introducing evidence showing that Bailey was in the habit of carrying large sums of money. Defendant moved in limine to preclude the state from introducing the evidence until it could show he had been aware of the habit. Defendant claimed that absent such a showing, the evidence had no relevance to establish motive. Based on the state's offer of proof, the trial court admitted evidence of Bailey's habit. When the state failed to meet the offer of proof, defendant moved for a mistrial. The motion was denied, notwithstanding the trial court's recognition that the prosecution had failed to meet its "specific and strict offer of proof." The court found the evidence was material and admissible to establish motive whether or not the defendant knew of the habit because the evidence showed that the defendant knew Bailey had sums of money.

The state's theory was that the defendant killed Bailey for her money—specifically, the rent money he was to relinquish to her and the money she would have in her purse when she came to collect it. Evidence that the defendant knew she was in the habit of carrying large sums of money was essential to support the proposition that he killed her for the additional money in her purse and not only for the rent money she was due.

Defendant is correct that absent proof that he knew of Bailey's alleged habit, evidence of that habit would be irrelevant to show motive and therefore inadmissible. However, the alleged motive, pecuniary

gain, was properly before the jury as there was evidence that the defendant, as part of his managerial duties, was required to collect and deliver rent money to Bailey every Saturday. Based on that evidence, the jury could have found the defendant killed Bailey to keep the money he was to relinquish. Therefore, the fact that the state failed to establish pecuniary motive by showing defendant knew Bailey habitually carried large sums of money renders admission of the evidence of the alleged habit non-prejudicial.

## UNDISCLOSED WITNESS

Defendant argues he was denied a fair trial because the state presented hearsay testimony and testimony of an undisclosed witness to prove motive. The facts relevant to disposition of this issue follow.

In response to a question by the state, Det. Quaife of the Phoenix Police Department testified that the last deposit into Bailey's Continental Bank checking account was made on August 30, 1981. On cross-examination it became clear that this testimony was hearsay and that Det. Quaife lacked personal knowledge of it.[6] To cure the improper admission, the court granted defendant's motion to strike and told the jury to disregard the statement until the state could prove it. The state then requested permission to call the custodian of the records of Continental Bank ("custodian"). Defense counsel argued that the state should be precluded from doing so because it had failed to disclose the custodian as a witness as required under Ariz.R. Crim.P. 15. The court granted the state's request. On appeal, the defendant challenges that decision.

The imposition and selection of sanctions for a violation of Ariz.R.Crim.P. 15 are within the sound discretion of the trial judge and will not be reversed on appeal unless there is a clear showing of abuse of discretion. *State v. Piedra,* 120 Ariz. 53, 583 P.2d 1373 (App.1978). The rule in Arizona is that it is frequently not an abuse of discretion for the trial court to permit a previously undisclosed witness to testify if the court believes that no prejudice will result to the accused or that any prejudice which might result may be rectified by other means. *Id. See also State v. Clark,* 112 Ariz. 493, 543 P.2d 1122 (1975). The trial court, however, should seek to apply sanctions that affect the evidence at trial and the merits of the case as little as possible since the Rules of Criminal Procedure are designed to implement, not to impede, the fair and speedy determination of cases. *State v. (Joseph Clarence, Jr.) Smith,* 123 Ariz. 243, 599 P.2d 199 (1979). Prohibiting the calling of a witness should be invoked only in those cases where other less stringent sanctions are not applicable to effect the ends of justice. *Id; see State v. (Joe U.) Smith,* 140 Ariz. 355, 681 P.2d 1374 (1984). The court should also consider how vital the precluded witness is to the proponent's case, whether the opposing party will be surprised and prejudiced by the witness' testimony, whether the discovery violation was motivated by bad faith or willfulness, and any other relevant circumstances. *Id.* We find no abuse of discretion in the trial court's decision to permit the custodian to testify.

We agree with the defendant that the custodian's testimony was not vital to the state's case; the state had other evidence

---

**6.** The record on cross-examination of Det. Quaife, reveals the following:

"Q. [by defense counsel]: The prosecutor asked you the date that there was last made a deposit into the bank account of the defendant [sic]. Do you have personal knowledge of that?

"A. [by Det. Quaife]: No, sir.

"Q. Now, did you obtain knowledge of when that last deposit was made into the account by making contact with some other person who worked at the bank?

"A. Not personally I didn't, no sir.

"Q. Now, did some other officer then make contact with somebody at the bank, and then the officer told you what the response was of the bank person concerning the date of the deposit?

"A. Yes, sir."

to support its claim that the defendant killed Bailey for pecuniary gain. *See* "Aggravating and Mitigating Circumstances" *supra.* However, we must reject the defendant's claims given our assessment of other factors enumerated in *Smith, supra.*

■ Defendant's claim that he was surprised and prejudiced by the custodian's testimony must fail. The state had informed the defendant that it intended to prove a pecuniary motive. Though he can claim that he did not expect the state to do so by showing that Bailey had not made a deposit in her checking account in approximately two weeks, he cannot claim he was surprised to the extent that he could not have adequately defended against it. Rule 15 was promulgated to enable an accused to advisedly prepare his defense. *State v. Von Reeden,* 9 Ariz.App. 190, 450 P.2d 702 (1969). Though the state did not inform the defendant that the custodian would be a witness, the defendant was on notice that the state would be seeking to prove a pecuniary motive for the murder. The custodian's testimony, at best, invited the jury to infer from the fact that Bailey had not made a recent deposit in her checking account that she had large sums of money on her person when she went to collect rent from the defendant.

Any prejudice the defendant might have suffered could have been reduced if not eliminated. On cross-examination, defense counsel could have inquired into the custodian's knowledge of whether Bailey had other bank accounts to which she might have made deposits after August 31[7] or requested a continuance so that he could pursue that inquiry on his own.

In addition, the record reveals no bad faith on the state's part. The prosecutor's express reason for seeking to introduce the evidence of the last date of deposit through Det. Quaife was to "save time." The prosecutor had not purposefully failed to in-form the defendant of his intention to call the custodian; instead, he had erroneously thought it was unnecessary to call her. The state's effort to expedite the proceedings in this way shows only a misconstruction of the Arizona Rules of Evidence; it does not show bad faith. The trial court did not abuse its discretion when it permitted the custodian to testify.

## FAILURE TO GIVE INSTRUCTIONS ON NEGLIGENT HOMICIDE AND HINDERING PROSECUTION

Defendant argues that the trial court erred in refusing to give his requested jury instructions on negligent homicide and hindering prosecution. We find no error.

■ A defendant is entitled to an instruction on an offense other than the one with which he or she is charged where (1) the offense is a lesser included offense of the one with which he or she is charged and (2) based on the evidence presented at trial, the jury could rationally find that the state failed to prove an element of the greater that distinguishes it from the lesser. *State v. Wise,* 137 Ariz. 477, 671 P.2d 918 (App.), *approved as modified,* 137 Ariz. 468, 671 P.2d 909 (1983); *State v. Celaya,* 135 Ariz. 248, 660 P.2d 849 (1983); *State v. Dugan,* 125 Ariz. 194, 608 P.2d 771 (1980).

### Negligent Homicide

■ The general rule is that negligent homicide is a lesser included offense of manslaughter. In *State v. Parker,* 128 Ariz. 107, 624 P.2d 304 (App.1980), *vacated in part on other grounds,* 128 Ariz. 97, 624 P.2d 294 (1981), the Court of Appeals determined that the only difference between manslaughter and negligent homicide is an accused's mental state at the time of the incident. *See also State v. Montoya,* 125 Ariz. 155, 608 P.2d 92 (App. 1980). Manslaughter is established where

---

7. Det. Quaife testified that the date of last deposit was August 30, 1981; the custodian testified that it was August 31, 1981.

a person, aware of a substantial and unjustifiable risk that his or her conduct will cause the death of another, consciously disregards that risk. Negligent homicide is established where a person fails to perceive the substantial and unjustifiable risk that his or her conduct will cause the death of another. The element of the greater not found in the lesser is awareness of the risk.

There is, however, a statutory exception to this rule. The Legislature has determined that when a defendant is unaware of a substantial and unjustifiable risk solely by virtue of his or her voluntary intoxication, that defendant must be charged with manslaughter, not negligent homicide. *See* A.R.S. § 13–105(5)(c); *State v. Bravo,* 131 Ariz. 168, 639 P.2d 358 (App. 1981) (voluntary intoxication is not a defense to manslaughter). Because lesser included offenses are such that one cannot commit the greater without necessarily committing the lesser, *State v. Wise, supra; State v. Celaya, supra; State v. Malloy,* 131 Ariz. 125, 639 P.2d 315 (1981), and because a voluntarily intoxicated person who recklessly causes the death of another has committed manslaughter but not negligent homicide, negligent homicide is not a lesser included offense of manslaughter where the defendant's sole defense is voluntary intoxication.[8]

At trial, defendant claimed that he had not murdered Bailey and that, if he had, he was unaware that he had due to his voluntary intoxication. Because voluntary intoxication is the sole reason for his failure to perceive that his actions would cause Bailey's death, negligent homicide was not a lesser included offense of manslaughter in this case. The trial court did not err when it failed to give a negligent homicide instruction.

*Hindering Prosecution*

Defendant argues that he was entitled to an instruction on hindering prosecution because his defense was that his wife, not he, had killed Bailey and that it was therefore reasonable for the jury to infer that he had only helped her dispose of the body. We reject this argument.

First, hindering prosecution is not a lesser included offense of homicide. To prove homicide, the state must show that a defendant with a particular mental state caused the death of another. *See* A.R.S. §§ 13–1102 to –1105. To prove hindering prosecution in the first degree, the state must show that a defendant intended to hinder the apprehension, prosecution, conviction, or punishment of another for a felony and that the defendant rendered assistance to such person. *See* A.R.S. § 13–2512. We find no elements common to both. Hindering prosecution is not a lesser included offense of any form of homicide.

Second, the fact that the jury could infer from the defense theory that the defendant assisted Ann Fisher in the murder of Bailey does not entitle the defendant to an instruction on hindering prosecution. A jury is impaneled to determine the guilt or innocence of a defendant for a crime with which he or she is charged, not to determine with which crimes a defendant should be charged. Because defendant was not indicted for hindering prosecution and because hindering prosecution is not a lesser included offense of the crime for which he was charged, the trial court properly denied the request for an instruction on hindering prosecution.

## JUROR EXCLUSION

In his appeal, defendant asserts two challenges to the voir dire conducted in his

---

8. This exception is narrowly drawn. Where a defendant presents a credible argument that his or her failure to perceive a risk was due to either voluntary intoxication or something else, negligent homicide would be a lesser included offense with respect to the defense that is unrelated to voluntary intoxication.

Defendant argues that the relevant risk he failed to perceive was that, if he started to drink, he would black out and kill someone.

Therefore, the argument goes, his failure to perceive the risk was *not* due to voluntary intoxication as it occurred before he started to drink. This argument is untenable. The risk suggested is not "of such nature and degree that disregard of such risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation" as required under A.R.S. § 13–105(5)(c).

case. He claims the trial court violated the Arizona constitutional protection for religious freedom when it excused two jurors because of their religious convictions and that the trial court's imposition of the death penalty was improper because defendant had been convicted by a death-culled jury. We find no error.

 The Ariz. Const. art. 2, § 12 states:

"No religious qualification shall be required for any public office or employment, nor shall any person be incompetent as a witness or juror in consequence of his opinion on matters of religion, nor be questioned concerning his religious belief in any court of justice to affect the weight of his testimony."

Defendant claims this article of the constitution prohibits a trial judge from asking prospective jurors if they have any religious beliefs that would affect their ability to determine the guilt or innocence of the defendant. We disagree. Art. 2, § 12 provides that no person shall be incompetent as a juror solely because of his opinion on matters of religion. It does not say an individual will be qualified as a juror *despite* his religious beliefs if those beliefs prevent him or her from being fair and impartial in a given case. Art. 2, § 12 must be read with art. 2, § 24 which guarantees the right of trial by an impartial jury. A person whose religious beliefs prevent him or her from finding a defendant guilty, notwithstanding proof beyond a reasonable doubt that the defendant *is* guilty, is not impartial. Such a person's presence on the jury would be improper. *State v. (Joseph Clarence, Jr.) Smith,* 123 Ariz. 231, 599 P.2d 187 (1979); *Mast v. Superior Court,* 102 Ariz. 225, 427 P.2d 917 (1967). The trial court may, at voir dire, question and excuse venire members who would not

be impartial for any reason, religious or otherwise.[9]

 We note further that the phrase "nor be questioned concerning his religious belief in any court of justice to affect the weight of his testimony" does not refer to jurors. This phrase imposes limits on the questions that may be asked of *witnesses* to bolster or impeach their testimonies. Jurors do not provide testimony. This phrase does not apply to them.

 The trial court did not abuse its discretion when it asked venire members if they had religious beliefs that would make it difficult or impossible for them to be impartial or when it excused two jurors who answered affirmatively.

 In addition, defendant submits his death sentence must be set aside under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We find no merit to this contention.

In *Witherspoon, id.* at 522, 88 S.Ct. at 1777, 20 L.Ed.2d at 785, the United States Supreme Court held that:

"a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."

The Court explicitly refused to find that the jury was not impartial on the issue of guilt because the evidence before it was "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." *Id.* at 517, 88 S.Ct. at 1774, 20 L.Ed.2d at 782. Because the jury in Arizona determines guilt or innocence only, the mandate of *Witherspoon* does not apply here. Defendant is

---

9. We note that cases cited by defendant are inapposite. They involve attempts to enhance a witness' credibility before the jury by introducing evidence of religious convictions, *Tucker v. Reil,* 51 Ariz. 357, 77 P.2d 203 (1938) (questioning of witness concerning membership in a particular church was improper); *Fernandez v. State,* 16 Ariz. 269, 144 P. 640 (1914) (questions

to an aged woman concerning her belief in God or the Great Spirit were improper), and an attempt to exculpate a defendant by offering evidence of his religious beliefs, *State v. Marvin,* 124 Ariz. 555, 606 P.2d 406 (1980) (court properly excluded testimony concerning a defendant's religious beliefs).

not entitled to have his sentence set aside under *Witherspoon.*

■■■ Though defendant's objection to the exclusion of Juror MacKenzie is based exclusively on *Witherspoon,* we will, pursuant to our duty to search the record for fundamental error, A.R.S. § 13–4035, examine the propriety of the exclusion pursuant to *Witherspoon's* Arizona progeny. In *State v. Ramirez,* 116 Ariz. 259, 569 P.2d 201 (1977), we considered the appellant's claim that the exclusion of three anti-death penalty venire members stacked the jury with "prosecution-prone" people who were implicitly biased on the issue of guilt. Assuming, without deciding, that the exclusion of death-scrupled venire members did result in a prosecution-prone jury, we applied the rule established in *Witherspoon* to Arizona voir dire questioning. We rejected the appellant's claim based on our finding that the excluded venire members had not been excused for general moral aversions to the death penalty, but instead,

"[they had been excused] because of their specific inability to separate their scruples on the matter of punishment from their duty to impartially decide the theoretically unrelated issue of guilt or innocence. In other words, even though the excluded veniremen recognized that the jury does not impose the sentence under Arizona law, they still felt that because of the possibility that the defendant may receive the death penalty, it would affect their vote on the issue of guilt and further their convictions on this matter were so strong that they would be unable to follow the court's instructions."

*Id.* at 264, 569 P.2d at 206.

The same is true in the instant case. The transcript of the voir dire reveals the following:

"Court (addressing Juror MacKenzie in chambers after the latter indicated an inability to determine guilt or innocence because of the sentence that might flow from that decision): Let's assume that the State has proved that he is guilty, in your mind, beyond a reasonable doubt. But you feel that he shouldn't be put to death for whatever reason, but all the evidence is there to show that he's guilty beyond a reasonable doubt, of first degree murder, but you don't think he should be put to death, for whatever reason.

"Would you then have a moral dilemma and not be able to render a verdict?

"Juror MacKenzie: I would have a moral dilemma.

\* \* \* \* \* \*

"Defense Counsel: You will be taking an oath, if you sit as a trial juror, to follow the instructions of law and to render a verdict solely based upon the law and the evidence as you find it.

"Will you be able to follow that oath and instructions of the Judge concerning the law, and then render an impartial verdict based on what you feel the evidence shows?

"Juror MacKenzie: I'm not sure that I can."

Juror MacKenzie, like the venire members in *Ramirez,* was excused because of a specific inability to separate his scruples on the matter of punishment from his duty to impartially decide the theoretically unrelated issue of guilt or innocence. We find no error.

## MOTION FOR A NEW TRIAL

On April 29, 1982, the jury found the defendant guilty of first degree murder. Defendant filed a motion for a new trial on May 4, 1982, based on the existence of "newly discovered evidence." Ariz.R. Crim.P. 24, 32.1(e). The evidence presented in support of this motion was a confession and sworn affidavit by the defendant's wife, Ann Fisher, in which she stated that she, rather than the defendant, had killed Bailey. After a hearing, the trial court denied the motion. The defendant appeals that decision.

■■■ Before post-conviction relief based on newly discovered evidence shall

be granted, the material presented must meet five requirements: (1) it must appear from the motion that the evidence relied on is, in fact, newly discovered, i.e., discovered after the trial; (2) the motion must allege facts from which the court can infer due diligence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) the evidence must be material to the issue involved; and (5) it must be evidence that would probably change the verdict if a new trial were ordered. *State v. Jeffers, supra.* Further, if the motion relies on the existence of a witness willing to testify and present the new evidence at a new trial, such witness must appear to be credible to the trial judge hearing the motion. *Id. State v. Salinas,* 129 Ariz. 364, 631 P.2d 519 (1981). In assessing the credibility of a prospective witness, the trial judge does not usurp the function of the jury. *State v. Urry,* 104 Ariz. 244, 450 P.2d 1018 (1969); *State v. Blankenship,* 99 Ariz. 60, 406 P.2d 729 (1965).

As motions for new trials are disfavored, *State v. Schantz,* 102 Ariz. 212, 427 P.2d 530 (1967), they should be granted with great caution. *Id.* Absent an abuse of discretion, we will not disturb the trial court's determination as to the need for a new trial. *Jeffers, supra; Salinas, supra.*

In a minute entry dated July 2, 1982, the trial court denied defendant's request for two reasons. First, he found that the evidence presented was not newly discovered because the thrust of the defense at trial was that Ann Fisher, rather than the defendant, was the guilty party. Second, he found the evidence was not credible and would not have affected the verdict because it was recanting testimony of a witness with a prior felony conviction and because it was one more in a series of conflicting stories offered by the witness.

We have previously recognized that there is no form of proof as unreliable as recanting testimony, *Axley, supra; State v. Hickle,* 133 Ariz. 234, 650 P.2d 1216 (1982); *State v. Sims,* 99 Ariz. 302, 409 P.2d 17 (1965), *cert. denied,* 384 U.S. 980, 86 S.Ct. 1880, 16 L.Ed.2d 691 (1966). In *Axley,* as in the instant case, the evidence in support of the defendant's petition for post-conviction relief was an affidavit of a co-defendant essentially corroborating statements made by the defendant at trial and exonerating the defendant of any complicity in the criminal acts. The trial court denied Axley's petition based on its findings that the co-defendant/affiant had made numerous statements in contradiction with statements in his affidavit and that the affidavit, had it been introduced at trial, would not have affected the verdict. On appeal, we found no abuse of discretion.

In the instant case, Ann Fisher's credibility and the probability that her affidavit would have altered the result were at least as doubtful as they were in *Axley.* Following her arrest in Iowa on September 17, 1981, Ann Fisher gave the police a thorough, step-by-step recitation of how the defendant, with premeditation, had killed Bailey. In a letter to the defendant, written January 11, 1982, she stated that a third party had killed Bailey and that the defendant had been "framed." In a second letter to the defendant, she told him that, if forced to take the stand, she would confess out of love for him. *See,* "Admissibility of Letters from Ann Fisher to Defendant," *supra.* In a third letter to the defendant, written two days after he was found guilty, she urged him to "go along on" the story she had written to the trial judge inculpating "Roger" as the person who killed Bailey. The trial court's findings that Ann Fisher was not a credible witness and that her testimony, had it been introduced at trial, would not have affected the verdict were more than justified. We find no abuse of discretion in the denial of the request for a new trial.

## AGGRAVATING AND MITIGATING CIRCUMSTANCES

At sentencing, the court found two aggravating circumstances and no mitigating circumstances sufficiently substantial to call for leniency. The death sentence was imposed. Pursuant to *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53

L.Ed.2d 1101 (1977), we have independently reviewed the record to determine the existence or absence of aggravating and mitigating circumstances and to determine if the death penalty was properly imposed.

The trial court found that the defendant had killed Bailey in expectation of the receipt of something of pecuniary value. A.R.S. § 13–703(F)(5). We agree. In their post-arrest statements, the defendant and his wife each stated that the defendant had killed Bailey for the approximately $500 rent money that they had collected for her. The absence of the initials "MB" on stubs in the rent receipt book supports their statements. Because the defendant's motive in killing Bailey was financial, A.R.S. § 13–703(F)(5) was properly found. *State v. Graham,* 135 Ariz. 209, 660 P.2d 460 (1983); *State v. Woratzeck,* 134 Ariz. 452, 657 P.2d 865 (1983).

The trial court also found that Bailey was killed in an especially heinous and depraved manner. Heinous and depraved go to the mental state and attitude of the perpetrator as reflected by his or her words and actions. *Woratzeck, supra; State v. Ceja,* 115 Ariz. 413, 565 P.2d 1274, *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977). At defendant's trial, Dr. Heinz Karnitschnig, Maricopa County Chief Medical Examiner and a specialist in anatomical and forensic pathology, testified that Bailey had died of head injuries. He said she had been dealt three separate blows with a claw hammer, each of which would have been fatal in itself. The blows were of great magnitude; they had shattered her skull and at least one had driven bone into her brain. This amount of violence was more than was necessary to rob and even kill the seventy-three-year-old victim.

Further, defendant's decision to murder Bailey for $500, notwithstanding the generosity and concern she had displayed for him and his wife, shows the depravity and heinousness of the deed. Bailey had given the Fishers a television set; she had also given Ann Fisher clothing. The circumstances surrounding the defendant's successful effort to kill Bailey support the conclusion that her murder was heinous and depraved within the meaning of A.R.S. § 13–703(F)(6). *See State v. Clark,* 126 Ariz. 428, 616 P.2d 888, *cert. denied,* 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980) (A.R.S. § 13–703(F)(6) found where defendant killed employers who had given him "a break" after he was released from a juvenile home).

In mitigation, the defendant offered the following factors for the court's consideration:

(1) the plea agreement and sentence of his wife, Ann Fisher;

(2) his lack of a criminal record;

(3) the adverse impact of the death penalty upon his family; and

(4) his impaired capacity to appreciate the wrongfulness of his conduct and conform his conduct to the requirements of law.

In a special verdict pursuant to A.R.S. § 13–703(D), the court specifically rejected the last of the offered factors and each of the other factors enumerated in A.R.S. § 13–703(G). It then stated its finding that there were no mitigating circumstances sufficiently substantial to call for leniency. Defendant claims the court violated its duty under *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979), to consider all mitigating factors presented by a defendant because the trial court did not specifically address the first three proffered factors in its special verdict. We disagree.

A.R.S. § 13–703(D) provides that:

"The court shall return a special verdict setting forth its findings as to * * * the existence of any of the [mitigating] circumstances included in subsection G of this section."

The statute does not require a trial court to set forth findings concerning mitigating circumstances offered by a defendant that are not explicitly enumerated in A.R.S.

§ 13–703(G). In the instant case, the fourth factor presented by the defendant was the only circumstance among those enumerated in subsection G. The trial court was not required to state its findings with respect to the other three proffered.

■ The fact that a trial court does not specifically address other mitigating factors presented by a defendant does not mean it did not consider them. We have been shown no reason to believe the trial court failed to fulfill its duty under *Watson.* .

■ Based on our independent review we agree with the trial court's finding of two aggravating circumstances and no mitigating circumstances sufficiently substantial to call for leniency. We therefore agree that the death sentence was properly imposed pursuant to A.R.S. § 13–703(E).

Defendant's argument that it is unconstitutional to require a defendant to prove the presence of mitigating circumstances has been previously considered and rejected. *See Watson, supra; State v. (Sylvester, Jr.) Smith,* 125 Ariz. 412, 610 P.2d 46 (1980).

### PROPORTIONALITY REVIEW

■ In addition to conducting an independent review of the sentence in a capital case, this Court examines prior cases to ensure that the death penalty is not disproportionately applied. *State v. McCall,* 139 Ariz. 147, 677 P.2d 920 (1983). We consider not only cases where the death penalty was imposed upon a finding of the same aggravating circumstances, but also cases where the death penalty was reduced to life imprisonment. Here, we have examined cases in which the defendant received the death penalty on one or both of the aggravating circumstances found in the instant case. *E.g., id.* (aspects of defendant's character did not outweigh findings that the killings were done for pecuniary gain and in a heinous, cruel, and depraved manner) and cases cited therein. 139 Ariz. at 162–63, 677 P.2d at 935–36. We have also reexamined the cases we reviewed in *McCall* where the death penalty was reduced to life imprisonment. *Id.* at 163, 677 P.2d at 936. We find imposition of the death penalty in this case is not disproportionate to the imposition of the death penalty in prior cases in this state.

### ENMUND REVIEW

■ In *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the United States Supreme Court held that a sentencing scheme which permits the imposition of the death penalty absent a finding that a defendant killed, attempted to kill, or intended to kill the victim violates the eight amendment of the United States Constitution. *Enmund* was filed on July 2, 1982. Though the defendant was convicted on April 28, 1982, he was not adjudged guilty and sentenced until July 12, 1982, ten days after *Enmund* became law. To insure that imposition of the death penalty was constitutional in this case, we have examined the record to determine if the finding required by *Enmund* was made. We find that it was.

In its special verdict rendered before sentencing the defendant to death, the trial court said, "The defendant was the individual who actually committed the offense." Imposition of the death penalty was made in compliance with *Enmund.*

■ Pursuant to A.R.S. § 13–4035, we have reviewed the entire record for fundamental error and have found none. The judgment and conviction are affirmed.

HOLOHAN, C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.