IN THE

# ARIZONA COURT OF APPEALS
### DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee,*

*v.*

MIGUEL FRANCISCO INZUNZA,
*Appellant.*

No. 2 CA-CR 2012-0273
Filed January 27, 2014

---

Appeal from the Superior Court in Pima County
No. CR20111274001
The Honorable Richard S. Fields, Judge

**AFFIRMED IN PART; VACATED IN PART**

---

COUNSEL

Thomas C. Horne, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel, Phoenix
By Diane Leigh Hunt, Assistant Attorney General, Tucson
*Counsel for Appellee*

Lori J. Lefferts, Pima County Public Defender
By David J. Euchner and Katherine A. Estavillo,
Assistant Public Defenders, Tucson
*Counsel for Appellant*

**OPINION**

Judge Eckerstrom authored the opinion of the Court, in which Presiding Judge Kelly and Judge Espinosa concurred.

E C K E R S T R O M, Judge:

**¶1**　　　　Following a jury trial, appellant Miguel Inzunza was convicted of two counts of sexual abuse and sentenced to consecutive prison terms totaling 4.5 years. On appeal, he contends the trial court erred in denying his motion to suppress and in precluding evidence relevant to his defense. He also challenges the out-of-state conviction used to enhance his sentences. We affirm his convictions and sentences but vacate the criminal restitution order that was entered erroneously at sentencing.

**Factual and Procedural Background**

**¶2**　　　　We view the evidence presented at trial in the light most favorable to upholding the verdicts, drawing all reasonable inferences from the evidence against the defendant. *See State v. Ramsey*, 211 Ariz. 529, ¶ 2, 124 P.3d 756, 759 (App. 2005). At the time of the offenses, the victim was a twenty-six-year-old woman who was moderately intellectually disabled and required twenty-four-hour care.[1] She did not understand most of the events happening around her, and she needed hands-on assistance for many daily tasks such as crossing the street, preparing food, and using the bathroom. Her communication skills were very limited, and the three-word sentences she could formulate were difficult to understand for someone who was unfamiliar with her. She was friendly and outgoing, with no sense of boundaries between

---

[1] Although the witnesses referred to the victim as being "mentally retarded," we use the current psychiatric term for this condition. *See Williams v. Cahill*, 232 Ariz. 221, n.1, 303 P.3d 532, 533 n.1 (App. 2013).

strangers and non-strangers. The victim's mother likened her to a two-year-old child.

¶3          On the morning of February 20, 2011, the victim was left alone in her mother's apartment. The caregiver who was expected to supervise her that day did not do so, and when the mother returned home from work in the evening she found the victim missing. Law enforcement officers then began a search that lasted several hours.

¶4          At approximately 2:00 a.m. the next day, police entered Inzunza's apartment, which was in the same complex, and discovered the victim lying next to him in his bedroom. The victim was partially undressed, and Inzunza was asleep next to her. When officers entered the bedroom, the victim jumped up, moved quickly toward them, and began pulling up her pants. She also said, "My baby, my baby," and rubbed her belly. The victim had a bruise or "hickey" visible on her neck, and a subsequent examination revealed another on her breast. Tests revealed the presence of Inzunza's DNA[2] on the victim's breast, and the victim's DNA was found on Inzunza's penis.

¶5          Inzunza's brother and his girlfriend, Gloria R., had been staying at Inzunza's apartment on the date of the incident, and they were sleeping on the living room floor when the police knocked and entered. According to Gloria, the victim had wandered into the apartment earlier in the evening when the door had been open, and she did not speak to anyone once she was there. The victim simply ate a plate of food Inzunza gave her, watched television, listened to music, and then followed Inzunza into his bedroom. Gloria described it as a "weird situation," and she said the victim seemed mentally disabled, because "all she did was laugh and wave."

¶6          Inzunza was charged with one count of sexual assault and one count of sexual abuse. In his defense, he maintained the evidence was insufficient to show the vaginal penetration necessary to sustain the sexual assault charge, and he claimed his sexual

---

[2]Deoxyribonucleic acid.

contact with the victim had been consensual. The jury failed to reach a verdict on the sexual assault charge, but it found him guilty of sexual abuse as a lesser-included offense, and it also found him guilty of the other count of sexual abuse. The trial court imposed enhanced sentences based on Inzunza's prior felony conviction from Washington, and this timely appeal followed.

## Motion to Suppress

**¶7**　　　Inzunza first contends the trial court erred in denying his motion to suppress that was based on the police officers' warrantless entry into his apartment. In reviewing this issue, we consider only the evidence presented at the suppression hearing, which we view in the light most favorable to upholding the court's ruling. *State v. Butler*, 232 Ariz. 84, ¶ 8, 302 P.3d 609, 612 (2013). We review the court's ruling for an abuse of discretion, to the extent it involves a discretionary issue, *State v. Moody*, 208 Ariz. 424, ¶ 62, 94 P.3d 1119, 1140 (2004), and we consequently defer to any factual findings that are supported by the record. *See State v. Davolt*, 207 Ariz. 191, ¶ 21, 84 P.3d 456 (2004); *State v. Rosengren*, 199 Ariz. 112, ¶ 9, 14 P.3d 303, 307 (App. 2000). But we review de novo the court's legal conclusions drawn from the facts, as well as any constitutional issues. *See Moody*, 208 Ariz. 424, ¶ 62, 94 P.3d at 1140.

**¶8**　　　In his motion, Inzunza sought to suppress all evidence resulting from the warrantless entry under both the Fourth Amendment to the United States Constitution and article II, § 8 of the Arizona Constitution. The state maintained the search was justified by the emergency aid exception to the warrant requirement. The trial court agreed and denied the motion on this ground. On appeal, Inzunza again contends the entry and search violated his federal and state constitutional rights.

**¶9**　　　The record shows that police officers responded to the report that the victim was missing just before 7:00 p.m. They were informed that she was a vulnerable adult with capabilities similar to a three-year-old child. The officers then went door to door in the apartment complex seeking information about her. One witness reported having seen a Hispanic man leading the victim around the

complex. At 1:49 a.m., another witness reported seeing the victim earlier in Inzunza's apartment.

¶10        Within five minutes of receiving this tip, officers gathered outside Inzunza's apartment and knocked loudly on the door for several minutes. When they looked through the window, they saw two people—a man and a woman—lying on the living room floor. The officers could tell the people were breathing, but they were unresponsive to the officers' repeated knocks and yells. Earlier in the evening, detectives had knocked on Inzunza's door as part of their canvassing effort, but no one had responded. Concerned for the well-being of the individuals inside, and believing that the victim might be in the apartment, the officers picked the lock on the door and entered.

¶11        While one officer checked on the two people lying on the floor, another officer went into the adjoining room of the one-bedroom apartment, where he immediately found the victim and Inzunza. The man and woman in the living room—Inzunza's brother and Gloria R.—subsequently were identified and found to be highly intoxicated.

¶12        Warrantless entries into and searches of homes are presumptively unreasonable and unconstitutional unless an exigent circumstance or "other clear necessity" justifies the action. *State v. Cañez*, 202 Ariz. 133, ¶ 52, 42 P.3d 564, 582 (2002). The emergency aid exception permits a warrantless entry into a dwelling when law enforcement officers "reasonably believe there is someone within in need of immediate aid or assistance." *State v. Fisher*, 141 Ariz. 227, 237, 686 P.2d 750, 760 (1984). The exception applies, in other words, when (1) police have reasonable grounds to believe there is an emergency that requires their immediate assistance to protect life or property and (2) there is a reasonable basis to associate the emergency with the place to be searched.[3] *Id.*

---

[3]Our supreme court also has required, as a third condition, that police "'not be primarily motivated by intent to arrest and seize evidence.'" *Fisher*, 141 Ariz. at 237-38, 686 P.2d at 760-61, *quoting People v. Mitchell*, 347 N.E.2d 607, 609 (N.Y. 1976); *accord State v.*

**¶13**　　　　Courts routinely apply the emergency aid exception to searches for missing persons. *E.g.*, *People v. Wharton*, 809 P.2d 290, 299-300, 324 (Cal. 1991) (upholding warrantless entry into apartment to locate missing occupant); *People v. Mitchell*, 347 N.E.2d 607, 608-10 (N.Y. 1976) (affirming warrantless entry into hotel room to search for missing chambermaid), *abrogated on other grounds by Brigham City v. Stuart*, 547 U.S. 398, 402, 404-05 (2006). The exception also has been applied when officers reasonably believed immediate medical assistance might be required for a person visible in a dwelling. In *State v. Russell*, 848 P.2d 657, 658-59 (Or. Ct. App. 1993), for example, the appellate court upheld a warrantless entry when a mother could not be awakened either by her young children, who were locked inside the home with her, or by the repeated efforts of a relative and a police officer, and the circumstances thus suggested she might either be asleep or "unconscious . . . because of a drug overdose." As our own supreme court has explained, "[B]ecause we do not want to deter police officers from engaging in searches for persons in distress, the exclusionary rule has no place here." *Fisher*, 141 Ariz. at 240, 686 P.2d at 763.

**¶14**　　　　In light of the circumstances here, which are equally if not more indicative of an emergency than those in *Russell*, we conclude the trial court did not abuse its discretion or otherwise err in denying Inzunza's motion to suppress. *See Fisher*, 141 Ariz. at 238, 686 P.2d at 761 (ruling will be upheld "absent clear and manifest error"). The combined circumstances of the missing-person report, the information obtained by police officers concerning the victim's

---

*Sharp*, 193 Ariz. 414, ¶ 13, 973 P.2d 1171, 1176 (1999); *State v. Jones*, 188 Ariz. 388, 395, 937 P.2d 310, 317 (1997). But this factor has since been rejected by the United States Supreme Court in *Brigham City v. Stuart*, 547 U.S. 398, 404-05 (2006), which held that the Fourth Amendment exclusively concerns whether the circumstances confronting state officials provided an objectively reasonable basis for the action. Assuming arguendo that this subjective factor still has a place in an independent analysis under article II, § 8 of our state constitution, this would not alter our reasoning or disposition here, given the record before us.

vulnerable status and probable location, and their observations outside Inzunza's apartment, all justified both the warrantless entry and the scope of the search.

¶15    The record supports findings that the police reasonably believed the victim would be found in Inzunza's apartment and that she was in danger without a proper caretaker. Moreover, police had knocked on the door of the apartment earlier in the evening, with no response. And the fact that persons, including a woman who might have been the victim, later appeared to be unconscious on the living room floor, further suggested a need for immediate entry and potential medical assistance. In sum, the police were justified in entering the apartment without a warrant and searching the places therein where the victim might reasonably be found.

**Precluded Evidence**

¶16    Inzunza next argues the trial court erred by excluding certain evidence of the victim's past. Before trial, the state filed a motion to preclude any evidence of an unrelated sexual assault against the victim in 2005. The motion was based, alternatively, on Rules 401 through 403, Ariz. R. Evid., and Arizona's rape shield statute, A.R.S. § 13-1421. Inzunza opposed the motion, arguing the victim's reactions to the prior sexual assault differed significantly from her reactions in the present case and thus served as a contrasting example of "non-consent."

¶17    In 2005, the victim ran out of an apartment when her guardian arrived; she then began crying and reported that her "secret hurts," referring to her vagina; and when asked how it hurt, she pointed to the apartment she had just left, saying, "Him." According to Inzunza, the prior incident therefore provided admissible evidence about the victim's ability to communicate and her capacity to consent to sexual intercourse. The trial court precluded the evidence without specifying the basis for its ruling. The court later explained, "The ability on one isolated occasion before to point out that she perceives pain does not indicate anything about whether she's capable of consenting to sexual activity."

¶18    We generally review a trial court's evidentiary rulings for an abuse of discretion, but we review de novo any questions of statutory construction or constitutional law. *State v. Armstrong*, 218 Ariz. 451, ¶ 20, 189 P.3d 378, 385 (2008). We may affirm a court's evidentiary ruling on any basis supported by the record. *State v. Robinson*, 153 Ariz. 191, 199, 735 P.2d 801, 809 (1987). Here, the court was justified in precluding the prior incident under Rule 403. We therefore do not reach Inzunza's arguments concerning the rape shield statute.

¶19    The crime of sexual abuse requires the state to prove that the defendant engaged in sexual contact without the victim's consent. A.R.S. § 13-1404(A). Section 13-1401(5)(b), A.R.S., provides that an act occurs "without consent" when the victim is incapable of consent due to a "mental disorder, mental defect, . . . or any other similar impairment of cognition" that is known or should reasonably be known to a defendant. Our supreme court has defined a "mental disorder" as a condition that prevents a victim from understanding the nature of the sexual act and its possible consequences. *State v. Johnson*, 155 Ariz. 23, 25-26, 745 P.2d 81, 83-84 (1987). Since the statute's amendment in 1998,[4] our legislature has further specified that a victim has a "mental defect" preventing consent if she "is unable to comprehend the distinctively sexual nature of the conduct or is incapable of understanding or exercising the right to refuse to engage in the conduct with another." § 13-1401(5)(b). Because this language follows case law from New Jersey, *see State v. Olivio*, 589 A.2d 597, 599, 605 (N.J. 1991), we find authority from that state instructive when interpreting the amended § 13-1401(5)(b). We agree, in particular, with New Jersey precedent stating that "the alleged victim's capacity to understand and consent to the proffered sexual conduct must be considered in the context of all of the surrounding circumstances in which it occurred." *Olivio*, 589 A.2d at 606.

¶20    In light of the context here, and the victim's evident and undisputed mental deficits, the prior sexual assault had de minimis probative value to issues that were material to this case. The

_____

[4]1998 Ariz. Sess. Laws, ch. 281, § 2.

victim's psychiatrist testified that the victim did not understand most things, including sexuality, and that he could not discuss anything directly with her. The victim's case manager likewise testified that the victim's extreme communication limitations prevented her from being understood by, and understanding, most people. The victim's mother further testified that the victim could not verbally express her feelings. In addition, the nurse who had performed the sexual assault examination in this case testified, by deposition, that when she had explained this medical procedure and had sought the victim's consent for it, the victim appeared to lack the ability to consent.

¶21 Thus, despite Inzunza's assertions, the earlier sexual assault is not especially probative on the question of the victim's legal capacity to consent to sexual activity. The prior incident did not show the victim had "knowledge about sex and procreation," *Johnson*, 155 Ariz. at 26, 745 P.2d at 84; rather, it tended to show an absence of such knowledge. Similarly, the earlier incident of victimization neither demonstrated that the victim "understood that her body was private and that she had a right to be free from the invasions of others," nor that she had the "ability to refuse to engage in sexual activity." *Olivio*, 589 A.2d at 604. The trial court was therefore justified in excluding the evidence under Rule 403 on the ground that any slight probative value of the evidence was substantially outweighed by its potential to confuse the jury, waste time, and cause unfair prejudice arising from a prior crime inflicted against the same victim. Instead of showing a capacity to consent, the prior incident demonstrated primarily that the victim was able to report physical pain and attribute its cause, as the court indicated here. Thus, we cannot conclude the court clearly abused its discretion by ruling the evidence inadmissible. *See State v. Williams*, 133 Ariz. 220, 230, 650 P.2d 1202, 1212 (1982); *see also Hudgins v. Sw. Airlines, Co.*, 221 Ariz. 472, ¶ 13, 212 P.3d 810, 819 (App. 2009) (observing "we accord substantial discretion to the trial court in the Rule 403 weighing process").

¶22 We recognize that "[t]he degree of intellectual impairment varies widely among the retarded," and the mere fact that a person is intellectually disabled does not mean that the person

cannot lawfully consent to sex.  *Olivio*, 589 A.2d at 604.  As the victim's psychiatrist acknowledged here, and as Inzunza argued as a defense, intellectually disabled people can have consensual sexual relations.  We also recognize that courts should be cautious when precluding evidence bearing on a victim's capacity to consent, as "[t]he vital interests underlying the Rape Shield Law are subverted if they are misapplied and misused to deny defendants a full and fair trial."  *State v. Cuni*, 733 A.2d 414, 432 (N.J. 1999) (Stein, J., dissenting).  The same is true when applying our rules of evidence.  *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (rules of evidence "may not be applied mechanistically to defeat the ends of justice").  Here, although the state's case depended on demonstrating that the victim lacked the capacity to legally consent to sexual activity, the evidence that was excluded had little, if any, probative value in rebutting this fact.  Therefore, the trial court did not err in implicitly concluding that any probative value was substantially outweighed by the risk of "unfair prejudice, confusing the issues, . . . [and] wasting time."  Ariz. R. Evid. 403.

## Prior Conviction

**¶23**		Inzunza further contends the trial court erred in sentencing him as a category two repetitive offender and in finding that his 1992 conviction from Washington was a "historical prior felony conviction" under the former A.R.S. § 13-703 applicable to this case.  2010 Ariz. Sess. Laws, ch. 194, § 2.  Whether a foreign conviction supports an enhanced sentence is a question of law we review de novo.  *State v. Smith*, 219 Ariz. 132, ¶ 10, 194 P.3d 399, 401 (2008).[5]

**¶24**		When Inzunza committed the present offenses, in February 2011, § 13-703(M) subjected offenders to enhanced sentences if they had been convicted in another jurisdiction of "an

---

[5]We find Inzunza's appellate arguments on this issue to be substantially the same as those he raised, and thus preserved, at the prior convictions trial.  But we would reach the merits of his claim in any event, given that an illegal sentence constitutes fundamental, prejudicial error.  *See Smith*, 219 Ariz. 132, ¶ 22, 194 P.3d at 403.

offense that if committed in this state would be punishable as a felony." 2010 Ariz. Sess. Laws, ch. 194, § 2. Once a foreign conviction passed this test, it could be used for sentencing enhancement, regardless of the age of the prior offense, if it qualified as a "[h]istorical prior felony conviction" under the former A.R.S. § 13-105(22)(a)(iii). 2008 Ariz. Sess. Laws, ch. 301, § 10. This subsection defined the term to include "[a]ny prior felony conviction for which the offense of conviction . . . involved the use or exhibition of a deadly weapon or dangerous instrument." *Id.*

**Arizona Felony**

¶25 In order to determine whether a foreign conviction would be a felony in Arizona, the test is whether it "includes 'every element that would be required to prove an enumerated Arizona offense.'" *State v. Crawford*, 214 Ariz. 129, ¶ 7, 149 P.3d 753, 755 (2007), *quoting State v. Ault*, 157 Ariz. 516, 521, 759 P.2d 1320, 1325 (1988).[6] "In other words, the foreign conviction must 'entail[] a finding by the former trier of fact, beyond a reasonable doubt,' of all the elements necessary for a specified Arizona offense." *State v. Moran*, 232 Ariz. 528, ¶ 16, 307 P.3d 95, 101 (App. 2013), *quoting State v. Norris*, 221 Ariz. 158, ¶ 6, 211 P.3d 36, 38 (App. 2009). This comparative analysis focuses exclusively on the statutory elements of offenses and any relevant case law, as opposed to the factual basis of a conviction. *See State v. Colvin*, 231 Ariz. 269, ¶ 9, 293 P.3d 545, 548-49 (App. 2013). Hence, "[a] charging document or judgment of conviction may be used only to narrow the statutory basis of the foreign conviction, not to establish the conduct underlying it." *Moran*, 232 Ariz. 528, ¶ 16, 307 P.3d at 101.

---

[6]Although in *Crawford*, 214 Ariz. 129, ¶ 1, 149 P.3d at 754, our supreme court specifically discussed the former A.R.S. § 13-604(N), 2003 Ariz. Sess. Laws, ch. 11, § 1, that provision is the same, in material part, as the former § 13-703(M) at issue here. *See* 2010 Ariz. Sess. Laws, ch. 194, § 2. Statutory changes that have since superseded *Crawford* are irrelevant to this decision. *See State v. Moran*, 232 Ariz. 528, ¶ 21, 307 P.3d 95, 102 (App. 2013) (recognizing 2012 amendments as legislative attempt to "simplify[] the use of out-of-state historical prior felony convictions").

¶26      At the prior-convictions trial here, the state introduced an information and judgment of conviction showing Inzunza had been convicted of second-degree assault with a deadly weapon, committed on December 14, 1991, in violation of the Revised Code of Washington ("Wash. Rev. Code") § 9A.36.021(1)(c) (1991). That subsection provides: "A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree . . . [a]ssaults another with a deadly weapon." *Id.*

¶27      Washington's criminal code does not define the predicate offense of simple assault, which is codified at Wash. Rev. Code § 9A.36.041(1) (1991); its elements instead are provided by the state's common law. *Clark v. Baines*, 84 P.3d 245, 247 n.3 (Wash. 2004). "Washington recognizes three definitions of assault: '(1) an attempt, with unlawful force, to inflict bodily injury upon another; (2) an unlawful touching with criminal intent; and (3) putting another in apprehension of harm whether or not the actor intends to inflict or is incapable of inflicting that harm.'" *Id.*, *quoting State v. Walden*, 841 P.2d 81, 83 (Wash. Ct. App. 1992); *accord State v. Hahn*, 271 P.3d 892, 893 (Wash. 2012); *State v. Frohs*, 924 P.2d 384, 390 (Wash. Ct. App. 1996). These definitions specify different manners or methods of committing the crime of assault, not separate offenses. *See State v. Davis*, 835 P.2d 1039, 1043 (Wash. 1992) (rejecting argument that "manners of committing assault are essential elements" of simple assault); *see also State v. Taylor*, 950 P.2d 526, 529 (Wash. Ct. App. 1998) (noting "an assault with a deadly weapon . . . may be committed three ways"). Yet regardless of how the crime is committed, intent is an implied element of assault, meaning the offense requires willful, knowing, or purposeful conduct. *Davis*, 835 P.2d at 1042; *see State v. Byrd*, 887 P.2d 396, 399 (Wash. 1995) (holding "specific intent either to create apprehension of bodily harm or to cause bodily harm is an essential element of assault in the second degree" regarding "two apposite definitions of criminal assault"); *see also State v. Jarvis*, 246 P.3d 1280, 1284 n.4 (Wash. Ct. App. 2011) ("'Criminal intent' . . . means the intent to do the physical act constituting assault, not the intent that one's actions be malicious or illegal."); *State v. Baker*, 151 P.3d 237, 239 (Wash. Ct. App. 2007) ("State need not prove specific intent . . . if unlawful physical contact occurs.").

¶28 On appeal, an appellant always carries the burden of demonstrating an error that entitles him to relief. *State v. Edwards*, 1 Ariz. App. 42, 44, 399 P.2d 176, 178 (1965). Here, Inzunza has failed to show that assault with a deadly weapon under § 9A.36.021(1)(c) of the Washington code could be committed in a way that would not be a felony if the offense were committed in Arizona.

¶29 He first notes that in Arizona, an assault by touching requires the specific mens rea of an "intent to injure, insult or provoke," A.R.S. § 13-1203(A)(3), and he argues that Washington's "common law definition includes any 'criminal intent,' which could include recklessness, and fall short" of the culpable mental state required in this state. But, in light of the authorities cited above, we reject the claim that recklessness would support a conviction for assault under Washington law.

¶30 As articulated by *Davis*, 835 P.2d at 1042, the common law intent required for assault in that jurisdiction would always appear to support an intentional or knowing mental state required for assault in Arizona. *See* 2008 Ariz. Sess. Laws, ch. 301, § 10 (A.R.S. § 13-105(10)(a), (b)). Moreover, Washington courts have specified that "[t]he intentional unlawful touching of the body of another is an assault." *State v. Parker*, 915 P.2d 1174, 1177 (Wash. Ct. App. 1996). They likewise have provided that "'[a] touching may be unlawful because it was neither legally consented to nor otherwise privileged, and was either harmful or offensive.'" *Jarvis*, 246 P.3d at 1284, *quoting State v. Thomas*, 989 P.2d 612, 614 (Wash. Ct. App. 1999). Inzunza therefore has not demonstrated any variance between the culpable mental states for these offenses that would entitle him to relief.

¶31 We are similarly unpersuaded by his argument that the Washington offense does not require the use or display of a deadly weapon, but could be committed merely by attempting to inflict bodily injury with an apparent present ability to do so. Washington law specifies that an item meets the definition of a "[d]eadly weapon" only if, "under the circumstances in which it is used, attempted to be used, or threatened to be used, [it] is readily capable of causing death or substantial bodily harm." Wash. Rev. Code § 9A.04.110(6) (1991). When this provision is read in conjunction

with Washington's second-degree assault statute, it becomes clear that assault with a deadly weapon requires proof that the defendant either (1) attempted to use the weapon to inflict bodily injury, (2) used the weapon to unlawfully touch someone, or (3) used or threatened to use the weapon to create apprehension of harm. *See* Wash. Rev. Code §§ 9A.04.110(6), 9A.36.021(1)(c); *Hahn*, 271 P.3d at 893. In Arizona, these scenarios would, at minimum, constitute the felony offense of attempted aggravated assault with a deadly weapon or dangerous instrument. *See* A.R.S. §§ 13-1001, 13-1203, 13-1204(A)(2), (D).[7]

**¶32** Accordingly, Inzunza has failed to demonstrate that the elements of his second-degree assault offense do not conform to Arizona law, and we have discovered no variance that would warrant relief under a fundamental error standard of review. *See State v. Fernandez*, 216 Ariz. 545, ¶ 32, 169 P.3d 641, 650 (App. 2007) ("[W]e will not ignore [fundamental error] when we find it.").

**Historical Prior**

**¶33** Having confirmed that the out-of-state conviction would be a felony in Arizona, we next must decide whether it was also a historical prior felony conviction under the former A.R.S. § 13-105(22). 2008 Ariz. Sess. Laws, ch. 301, § 10. We assume, without deciding, that an exclusive analysis of statutory and common-law elements is likewise applicable to this determination. *See State v. Sharma*, 216 Ariz. 292, ¶ 30, 165 P.3d 693, 699 (App. 2007) (analyzing federal statutes under prior Arizona repetitive-offender law). By considering only the elements of the offenses, we thereby ensure that the prior fact-finder actually made all the relevant legal determinations, *see State v. Morrison*, 181 Ariz. 279, 281, 889 P.2d 637, 639 (App. 1995), and we also free courts from "the burden of making factual determinations about the defendant's underlying conduct." *Crawford*, 214 Ariz. 129, ¶ 9, 149 P.3d at 756.

---

[7]We cite the current version of our aggravated assault statute, A.R.S. § 13-1204, as the relevant provisions have not changed since its amendment. *See* 2011 Ariz. Sess. Laws, ch. 90, § 6.

¶34        As noted above, the conviction here was statutorily narrowed by Inzunza's information and judgment, which specified that his offense was committed under the subsection that proscribes "[a]ssault[] . . . with a deadly weapon." Wash. Rev. Code § 9A.36.021(1)(c). The judgment also included a special finding, as alleged in the information, that Inzunza had been armed with a "deadly weapon" when he committed the offense, in violation of Wash. Rev. Code § 9.94A.125 (1991). A "deadly weapon" is defined by this statute as "an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death." *Id.*

¶35        For sentence enhancement purposes, the former A.R.S. § 13-105(22)(a)(iii) defined an offense as a historical prior felony conviction if it "involved the use or exhibition of a deadly weapon or dangerous instrument." 2008 Ariz. Sess. Laws, ch. 301, § 10. The definition of a "dangerous instrument" under the former A.R.S. § 13-105(12), in turn, encompassed precisely that which would be a "deadly weapon" under Washington law. *Compare* 2008 Ariz. Sess. Laws, ch. 301, § 10 ("'Dangerous instrument' means anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury."), *with* Wash. Rev. Code § 9A.04.110(6) ("'Deadly weapon' . . . include[s] any . . . weapon, device, instrument, article, or substance . . . which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm."). Because the Washington conviction was therefore a valid historical prior felony conviction, we find no error with respect to Inzunza's enhanced sentences.

## Criminal Restitution Order

¶36        In conducting our review of the record, we observed that the trial court reduced various fees and assessments to a criminal restitution order (CRO) at sentencing and further ordered "no interest, penalties or collection fees to accrue" while Inzunza was imprisoned. Although the parties did not raise this issue on appeal, we have determined that in these circumstances "the imposition of a CRO before the defendant's probation or sentence

has expired 'constitutes an illegal sentence, which is necessarily fundamental, reversible error.'" *State v. Lopez*, 231 Ariz. 561, ¶ 2, 298 P.3d 909, 910 (App. 2013), *quoting State v. Lewandowski*, 220 Ariz. 531, ¶ 15, 207 P.3d 784, 789 (App. 2009).

## Disposition

**¶37**      For the foregoing reasons, we vacate the CRO. Inzunza's convictions and sentences are otherwise affirmed.