NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

ESTEVANICO DOS QUILOMBO PALMARES, *Appellant.*

No. 1 CA-CR 23-0245

FILED 10-10-2024

Appeal from the Superior Court in Maricopa County
No. CR2020-120106-001
The Honorable Rosa Mroz, Judge (*Deceased)*
The Honorable Kevin B. Wein, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael T. O'Toole
*Counsel for Appellee*

Zhivago Law PLLC, Phoenix
By Kerrie Droban Zhivago
*Counsel for Appellant*

―――――――――――――――

**MEMORANDUM DECISION**

Judge Samuel A. Thumma delivered the decision of the Court, in which Presiding Judge Maria Elena Cruz and Judge Andrew M. Jacobs joined.

―――――――――――――――

**T H U M M A**, Judge:

¶1          Defendant Estevanico Palmares appeals his convictions and sentences for two counts of second-degree murder and one count of misconduct involving weapons, arguing reversible error on four grounds. First, he argues the superior court erred in admitting evidence obtained through an illegal warrantless search. Second, he argues the court erred by denying his motion for mistrial after the jury heard he had been incarcerated. Third, he argues the court erred by admitting hearsay evidence that he also argues was unfairly prejudicial. Fourth, he argues the court erred in denying his attorney's motion to withdraw. Because Palmares has shown no reversible error, his convictions and sentences are affirmed.

**FACTS AND PROCEDURAL HISTORY**

¶2          At about 10:45 a.m. on May 18, 2020, a 9-1-1 call reported gunshots associated with one unit of a four-unit apartment building in a high-crime area of Phoenix. Although requested, no police officers were dispatched to respond to that call. Later that day, at about 3:15 p.m., another 9-1-1 caller requested a welfare check at the same unit. The caller reported hearing gunshots from that unit at around nine or ten in the morning, and she was concerned the apartment's front door was still open. Neighbors also reported it was unusual for the door to remain open. Two police officers responded to the second call just after 3:30 p.m.

¶3          Upon arrival, the officers noted that the front door to the unit reported in the calls was closed, but the front door of the adjacent unit was open. Palmares lived in the unit with the open front door. Palmares lived there with his wife, C.P., and a male roommate, R.A. The unit had a front patio with an exterior gate, surrounded by solid six-foot-tall walls. The exterior gate had slats allowing someone outside the gate to see through it. From the outside of the gate, the responding officers could see the very top of the open front door. They could not, however, see inside the unit.

¶4        Assuming the callers had been mistaken about the specific unit, officers updated the call location to the unit with the open door. That update revealed that Palmares lived in the unit and that he was "very anti-pd," or police department, which prompted a call for backup. Officers discovered Palmares had an outstanding arrest warrant, and he had previously been detained for domestic violence. Officers announced themselves and tried calling the number listed for Palmares' unit but received no answer.

¶5        After obtaining supervisor approval for a welfare check, one officer picked the lock to the slatted gate and, at 4:01 p.m., entered the patio of the unit. As they approached the front door, they could then see bodies on the floor, later confirmed to be victims C.P. and R.A. Officers immediately conducted a "protective sweep" of the unit and found no one else inside. Officers then obtained a search warrant, which they executed at 8:55 p.m. During the execution of that search warrant, officers recovered four spent bullet casings marked "Blazer .380 auto" and a Bersa firearm box.

¶6        The next day, after receiving an anonymous tip about a possible homicide suspect, officers encountered Palmares. Palmares ran after seeing police vehicles. After chasing him on foot, officers arrested Palmares and found a Bersa gun underneath a nearby vehicle. The gun matched the serial number from the firearm box found at Palmares' unit. The bullets recovered from the victims' bodies also had "a high degree of correspondence" with bullets fired from the Bersa gun.

¶7        Palmares was charged with two counts of second-degree murder, Class 1 dangerous felonies, and one count of misconduct involving weapons, a Class 4 felony. Palmares moved to suppress evidence obtained from the warrantless entry into his unit. After an evidentiary hearing, the superior court initially granted Palmares' motion. The State then moved to reconsider; the superior court held another evidentiary hearing and granted the motion to reconsider, based on inevitable discovery.

¶8        The State filed a notice of intent to admit C.P.'s notebook, containing journal entries describing her troubled marriage, Palmares' jealousy and his repeated accusations that she was cheating on him. The State also sought to admit "other act" text messages detailing domestic disputes between C.P. and Palmares involving law enforcement, as well as text messages indicating Palmares purchased, possessed and fired a firearm. Palmares objected and after full briefing, an evidentiary hearing and oral argument, the court found C.P.'s journal entries and the text messages were admissible.

¶9          At a February 2023 trial, the jury found Palmares guilty on both counts of second-degree murder and that the State had proven four aggravators. The superior court denied Palmares' motion for new trial and/or for judgment of acquittal. The misconduct involving weapons was tried separately to the court, after Palmares waived his right to a jury trial, and the court found him guilty on that charge.

¶10          Given Palmares had a prior conviction of a Class 3 dangerous felony, the superior court sentenced him to the maximum prison term of 29 years for each of the murder convictions, to be served consecutively. *See* Ariz. Rev. Stat. (A.R.S.) § 13-710(B)(2024).[1] The court sentenced him to 10 years in prison for the misconduct involving weapons conviction, to be served concurrently with the first murder conviction. The court properly awarded him 1,126 days for his presentence incarceration. This court has jurisdiction over Palmares' timely appeal pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), 13-4031 and 13-4033(A).

## DISCUSSION

### I.     Palmares Has Not Shown Reversible Error in the Denial of his Motion to Suppress.

¶11          In reviewing the denial of a motion to suppress, this court limits its review to the facts considered at the suppression hearing, *State v. Blackmore*, 186 Ariz. 630, 631 (1996), viewed in the light most favorable to sustaining the superior court's ruling, *State v. Hyde*, 186 Ariz. 252, 265 (1996). This court defers to the superior court's factual findings but reviews questions of law de novo. *See State v. Gonzalez–Gutierrez*, 187 Ariz. 116, 118 (1996). The superior court's ruling will be upheld if it is correct for any reason. *State v. Canez*, 202 Ariz. 133, 151 ¶ 51 (2002).

¶12          In granting the State's motion to reconsider in part, the superior court found the State had proven by a preponderance of the evidence that "evidence of the dead bodies, and all of the evidence discovered within [Palmares' apartment] would have been discovered by lawful means." The court cited the following reasons for its conclusion:

---

[1] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

(1) R.A.'s sister "would have noticed [he] was missing within a day of his death and reported him missing;"

(2) "The bodies would have given off putrid odors, and there would have been significant insect activity around the bodies within 2 days, or earlier" and "[t]he police would have investigated the missing person and any place in which there are odors of decomposing bodies and significant insect activity;"

(3) Palmares "would have had a very difficult time disposing of the dead bodies given their girth, and because the police and private security would have monitored [Palmares'] apartment closely due to the open front door" and

(4) Palmares "was arrested before he would have had the chance to dispose of the bodies because he already had a warrant out for his arrest."

¶13 Under the exclusionary rule, illegally obtained evidence will be suppressed or excluded at trial unless an exception applies. *State v. Ault*, 150 Ariz. 459, 465 (1986). The inevitable discovery doctrine is one such exception. *Id.* The inevitable discovery doctrine provides that "evidence obtained as a result of an unlawful search need not be suppressed when, in the normal course of police investigation and conduct, and absent the illicit conduct, the evidence would have been discovered inevitably or ultimately." *State v. Acosta*, 166 Ariz. 254, 258 (App. 1990).

¶14 Arizona law has recognized this exception where officers found evidence during an illegal pat-down where the defendant "would have been arrested on independent grounds and the evidence would inevitably have been discovered during a lawful search incident to that arrest," *State v. Davolt*, 207 Ariz. 191, 205 ¶ 38 (2004), or where officers searched a car without a warrant and found evidence that would have been discovered during an inventory search, *State v. Jones*, 185 Ariz. 471, 481 (1996). This case, however, is more comparable to *Brown v. McClennen*, the Arizona Supreme Court's most recent case applying the inevitable discovery doctrine, where the State illegally obtained a sample of the

5

defendant's blood. 239 Ariz. 521 (2016). The State later argued the evidence was admissible because, if the defendant "had refused consent, the deputy would have obtained a search warrant and legally drawn Brown's blood." *Id.* at 524 ¶ 13. *Brown* affirmed the ruling that the inevitable discovery doctrine did not apply, because it was not inevitable that law enforcement would have obtained the sample "by lawful, independent means." *Id.* at 525 ¶ 15. Rather, law enforcement could only have obtained the sample "by means of a search warrant. But because the inevitable discovery exception cannot excuse the failure to secure a warrant in the first place, the exclusionary rule applies." *Id.*

¶15        Significantly, the State points to no Arizona case concluding the inevitable discovery doctrine would apply here. As *Brown* cautioned, the doctrine is bounded by lawful action from law enforcement that inevitably would follow:

> The State's view of the inevitable discovery exception would swallow the rule. The exception does not turn on whether the evidence would have been discovered had the deputy acted lawfully in the first place. . . . Rather, the exception applies if the evidence would have been lawfully discovered despite the unlawful behavior and independent of it.

239 Ariz. at 524–25 ¶ 14. And the out-of-state cases cited by the State about the "inescapable odor of a decaying body" would apply only if Palmares did not dispose of the bodies before that occurred. *See Acosta*, 166 Ariz. at 258 (applying the inevitable discovery doctrine where "evidence would have been discovered inevitably or ultimately"). Accordingly, the inevitable discovery doctrine does not apply here.

¶16        Recognizing the superior court's ruling will be upheld if it is correct for any reason, *Canez*, 202 Ariz. at 151 ¶ 51, and tacitly conceding issues with inevitable discovery, the State's primary argument is that denial of the motion to suppress was proper because the officers acted reasonably under the emergency–aid exception. While warrantless entries into homes are presumptively disallowed, the emergency aid exception authorizes such warrantless entries when "(1) police have reasonable grounds to believe there is an emergency that requires their immediate assistance to protect life or property and (2) there is a reasonable basis to associate the emergency with the place to be searched." *State v. Inzunza*, 234 Ariz. 78, 82 ¶ 12 (App. 2014).

¶17    The superior court here rejected the application of the emergency aid exception because officers "did not make entry until 5.5 hours after the shots were fired" and "did not witness anything that corroborated their belief that there was an active emergency situation." While the court noted Arizona cases recognizing the emergency aid exception contain facts where "police responded almost immediately to the crime tips that they received, and/or the police witnessed events that corroborated their belief in an active emergency situation," Arizona case law also dictates that "[d]elay alone . . . does not bar reliance on the emergency aid exception." *State v. Sharp*, 193 Ariz. 414, 419 ¶ 14 (1999).

¶18    Here, officers testified they did not respond to the first 9-1-1 call reporting shots fired "because of the number of shots fired calls that happen throughout the city." However, officers responded about fifteen minutes after the second 9-1-1 call requesting a welfare check and reporting the apartment door was still open, a particularly unusual occurrence given the high rate of violence at this apartment complex. They then obtained supervisor approval to enter the outside gate to perform a welfare check and, after entering the patio, they saw two bodies through the open front door of Palmares' unit.

¶19    Though these actions came hours after the first 9-1-1 call, officers responded less than twenty minutes after the request for a welfare check. The second call was also when they were first told of the open front door in an area with "the highest call volume of violent calls" in Phoenix. Officers testified that though they did not hear gunshots when they arrived, they knew individuals could survive for "quite a while" if they apply pressure to a gunshot wound and did not feel comfortable "waiting several hours" that it would take to secure a warrant "when there's a possibility there could be something going on inside." On these facts, officers had "reasonable grounds to believe there [was] an emergency" and someone inside might need aid. *See Inzunza*, 234 Ariz. at 82 ¶ 12.

¶20    "[I]n cases such as the emergency aid exception where the warrantless search is limited by the exigency that gives rise to it, the officer's perception of the exigency is a necessary limitation on the search." *In re Tiffany O.*, 217 Ariz. 370, 377 ¶ 25 (App. 2007). Notably, officers here did not make initial entry into Palmares' apartment. Rather, after seeing the open door, they entered the patio through the gates to secure the open front door, which was visible from outside and under alarming circumstances. Once they entered the patio, they saw R.A.'s body through the open front door, after which they conducted a "protective sweep" of the home and, finding the two bodies but nobody alive in the home, sought and obtained a

warrant. The initial entry was short in duration, minimally invasive, and limited to the exigency giving rise to the emergency. On this record, albeit for different reasons than identified by the superior court, Palmares has not shown error in the denial of his motion to suppress.

## II.     The Superior Court Did Not Abuse Its Discretion in Denying Palmares' Motion for Mistrial.

¶21     This court reviews the denial of a motion for a mistrial based on the jury hearing inadmissible evidence for an abuse of discretion. *State v. Welch*, 236 Ariz. 308, 314 ¶ 20 (App. 2014). Two factors are particularly relevant to that inquiry: "(1) whether the remarks called to the attention of the jurors matters that they would not be justified in considering in determining their verdict, and (2) the probability that the jurors, under the circumstances of the particular case, were influenced by the remarks." *State v. Stuard*, 176 Ariz. 589, 601 (1993). Mistrial is "the most dramatic remedy for trial error and should only be granted when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Dann*, 205 Ariz. 557, 570 ¶ 43 (2003) (citation omitted).

¶22     Here, during the State's questioning of Palmares' sister, his incarceration was referenced as follows:

> STATE:      Are you close to your brother?
> WITNESS:    Yes.
> STATE:      And do you two talk frequently?
> WITNESS:    Before, yes.
> STATE:      What do you mean by "before"?
> WITNESS:    He's incarcerated.
> STATE:      Are you aware that while he's incarcerated, the Maricopa County Jail records all of his phone conversations?
> WITNESS:    Yes.
>                    * * *
> STATE:      So, until a few months ago, you did continue talking to him while he was incarcerated?
> WITNESS:    Yes.
>                    * * *
> STATE:      Prior to his incarceration, how frequently did you see your brother?
> WITNESS:    Not often.

Following these exchanges, at sidebar, Palmares' counsel objected and requested a mistrial. The court ordered "there be no more references to [Palmares'] incarcerated status" and took the motion for mistrial under advisement.

¶23 When later denying the motion for mistrial, the court acknowledged Palmares' incarceration should not have been mentioned but found that "the particulars of" the case "suggest that the jurors would not be improperly influenced." The final instructions the court gave the jury included the following: "[w]hether the defendant has been in custody at any time should not be considered by you for any purpose, influence your view of the evidence or impact your deliberations in any way." Palmares now argues the court erred because the State "deliberately invited the error, (emphasized it multiple times) and unnecessarily drew attention to [Palmares'] status."

¶24 The jury should not have heard about Palmares' incarceration. And the State's reference to the jail call recordings indicates the topic should have been addressed before trial. That did not occur. On this record, however, the superior court properly could conclude that these passing references to Palmares' custody status did not deprive him of the presumption of innocence. *See State v. Murray*, 184 Ariz. 9, 35 (1995) ("Certainly the jurors were aware that defendants were arrested and had spent some time in custody prior to trial. Such knowledge is not prejudicial and does not deny defendants the presumption of innocence."). Recognizing the superior court "is in the best position to determine whether the evidence will actually affect the outcome of the trial," *State v. Jones*, 197 Ariz. 290, 304 ¶ 32 (2000), it found that "the jury knows that the defendant was arrested 'cause they saw it on the video" which was admitted without objection and played for the jury. The court properly observed that the jury could "presume that he spent some time in custody." The court also noted Palmares was "charged with second-degree murder. I think it stands to reason that a juror would assume that the defendant has spent some time in custody on these matters." Accordingly, although the jury should not have heard that Palmares had been in custody, he has not shown the superior court abused its discretion in denying his motion for mistrial.

## III. The Superior Court Did Not Abuse Its Discretion in Admitting Journal Entries and Text Messages in Evidence.

¶25 Palmares argues the superior court abused its discretion in admitting three of C.P.'s journal entries as well as some text messages between R.A. and his sister. The superior court found the text messages

admissible under the present sense impression exception as well as Rule 807, the residual exception to hearsay. Though Palmares asserts that introducing the text messages was error, he does not develop this argument on appeal. Accordingly, Palmares has waived this argument. *See State v. Sanchez*, 200 Ariz. 163, 166 ¶ 8 (App. 2001) (finding waiver for failure to develop argument).

**¶26**      To qualify for the present sense impression exception to the rule against hearsay, the evidence must be "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Ariz. R. Evid. 803(1). The permissible amount of time elapsed between the event and the statement depends on the totality of the circumstances of each individual case. *See State v. Tucker*, 205 Ariz. 157, 166 ¶ 45 (2003). Superior courts have "some latitude in finding whether a statement was made immediately after the event." *Id.* at 166 ¶ 46. Admissibility is reviewed for an abuse of discretion. *Id.* at 165 ¶ 41.

**¶27**      Two of C.P.'s journal entries state they were written in September 2016, and the third entry is undated. All describe Palmares' jealousy and his accusations that she was being unfaithful to him. Palmares now argues C.P.'s journal entries were "neither 'immediate,' nor descriptive of particular 'events' 'as they unfolded,'" but instead "memorialized" earlier events, and as such do not fall under the exception.

**¶28**      The superior court noted C.P.'s journal entries "describ[e] in present tense the disagreements she is having with [Palmares] and that he is accusing her of cheating. She describes her feelings and emotions and appears to be writing in her journal to work through her emotions." A declarant's use of present tense suggests the statement was made "either during [the event described] or shortly thereafter." *State v. Damper*, 223 Ariz. 572, 576 ¶ 17 (App. 2010).

**¶29**      C.P.'s writings describe events both in the present tense and past tense. For the events described in the present tense, they easily fit within the present sense impression exception to the rule against hearsay. *See* Ariz. R. Evid. 803(1). And the remaining events are described as recent occurrences and properly were admitted under this exception. Accordingly, C.P.'s journal entries were properly admitted as present sense impressions, meaning this court need not address whether they were admitted under the residual exception to the rule against hearsay. *See* Ariz. R. Evid. 807.

¶30 Palmares also argues the superior court erred in admitting the writings and texts because "their prejudicial effect substantially outweighed any probative value." The superior court has broad discretion because it "is in the best position to balance the probative value of challenged evidence against its potential for unfair prejudice." *State v. Connor*, 215 Ariz. 553, 564 ¶ 39 (App. 2007).

¶31 Palmares asserts "[t]he journal entries and text messages between R.A. and his sister were unfairly prejudicial because they strongly (and unfairly) characterized [Palmares'] relationship with C.P. at least four years prior, as volatile and ripe with accusations of alleged infidelity." Though some of C.P.'s journal entries were from 2016, the superior court found "that the remoteness in time is a factor to be considered by the jury when determining the weight to be given to this evidence." The court also found C.P.'s writings "to be inherently reliable as they were written in [C.P.'s] private journal where she would have no motive to fabricate." Palmares has shown no Rule 403 error in admitting C.P.'s journal entries.

¶32 The text message exchange occurred leading up to the murders. The superior court found R.A. had "no motive to lie to his sister in private text messages regarding [Palmares'] jealousy, possession of a gun and [his] need to get out." Furthermore, R.A.'s sister was "available to testify at trial and [was] subject to cross examination." On this record, Palmares has shown no abuse of discretion in the court rejecting his Rule 403 objections.

## IV.    The Superior Court Did Not Abuse Its Discretion in Denying Counsel's Motion to Withdraw.

¶33 Palmares argues that the superior court's denial of his request for another attorney (who would have been his third) "effectively forced [Palmares] to continue with [trial counsel] or risk an involuntary waiver of his right to counsel," asserting Palmares and his attorney had a "completely fractured relationship, clearly an 'irreconcilable conflict.'" This court reviews the denial of a motion to withdraw for an abuse of discretion. *Jones*, 185 Ariz. at 482. When deciding such a motion, the superior court properly considers factors including: (1) "whether an irreconcilable conflict exists between counsel and the accused, and whether new counsel would be confronted with the same conflict;" (2) "the timing of the motion;" (3) "inconvenience to witnesses;" (4) "the time period already elapsed between the alleged offense and trial;" (5) "the proclivity of the defendant to change counsel" and (6) "quality of counsel." *State v. LaGrand*, 152 Ariz. 483, 486–87 (1987) (citing cases).

¶34        During pretrial proceedings in late 2020, Palmares requested new counsel citing a "breakdown in communication." The superior court granted the request and appointed new trial counsel. In the summer of 2022, on three occasions, Palmares requested new counsel and then withdrew his requests. In January 2023, Palmares filed a letter seeking to dismiss counsel, citing a "breakdown in communication," but the court found "the issues in the letters have already been addressed" and took no action on them.

¶35        At a January 2023 final trial management conference, a week before trial was scheduled to start, Palmares requested a Spanish-speaking attorney, which the court denied, noting "[t]he Court believes [Palmares'] request for a Spanish-speaking attorney is a delay tactic only and notes that [Palmares] has never before requested a Spanish-speaking attorney." The court also noted that Palmares had long been participating in his case, writing and commenting in English and demonstrating an "advanced vocabulary." At this same conference, Palmares was "removed from the courtroom for being disruptive and uncooperative." Palmares' counsel expressed "concerns for his safety during trial if this case proceeds to trial" and expressed a belief that "there has been a breakdown in communication." Acknowledging the concerns, the court noted (with assent by counsel) the likelihood that any attorney "would have a communication breakdown" with Palmares. The court then denied a renewed motion to withdraw by Palmares' counsel.

¶36        At the trial setting hearing held the next week before a different judge, Palmares' counsel renewed his motion to withdraw, which the court denied given its prior rulings. Palmares then cursed "at the court and threaten[ed] his attorney" before requesting to be removed from the courtroom. At a status conference the next week, Palmares directly made representations to the court requesting new counsel and moving to continue trial, which the court denied. Despite Palmares' repeated outbursts leading up to trial, the trial itself – where Palmares was represented by the same attorney – then proceeded without major incident.

¶37        The record provides evidence that "new counsel would [have been] confronted with the same conflict," that Palmares had already changed counsel, and that the motions complained of here were made very close to trial and identified by the superior court as a delay tactic. Recognizing the importance of these factors as stated in *LaGrand*, 152 Ariz. at 486–87, on this record, Palmares has not shown the court abused its discretion in denying counsel's motion to withdraw.

## CONCLUSION

¶38        Palmares' convictions and sentences are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:    AGFV